Hodges *v.* Eddy.

## HANNIBAL HODGES *v.* DANIEL P. EDDY.

*Ejectment. Constructive Possession. Color of Title. Adverse Occupation. Acquiescence in Division Line. Disseizin. Estoppel.*

Constructive possession defined to be *a possession in law, without possession in fact.*

One who enters into and holds possession of a portion of the land covered by his deed, claiming under his deed, is, by construction, and by virtue of his claim under his deed, legally in possession of all that his deed covers.

There cannot be two constructive possessions of the same land at the same time; therefore, while one is thus in possession, no other person can have or gain a constructive possession of any part of his land, and he can be disseized in no other way than by actual entry and occupation of another.

There is one mode, however, in which the true owner of land can lose his constructive possession, without being actually dispossessed, to wit: where the owner agrees with an adjoining proprietor on a distinct and visible line of division between them, which is really within the true line, and withdraws all claim to the land lying beyond the agreed line, his constructive possession is limited to that line, and the possession of the adjoining proprietor who claims to such line, is extended by construction to the agreed line; and if such mutual claim and acquiescence is continued for the period of fifteen years, the title becomes fixed, upon both sides, to such line.

So, when one enters upon an unoccupied lot under *color of title*, and actually occupies a part, claiming the whole, his actual possession is extended by construction, to all that his deed, or other colorable title, covers.

The term *color of title*, as it is used in the cases, means a deed or survey of land, placed upon the public records of land titles, whereby notice is given to the true owner, and all the world, that the occupant claims the title.

In the earlier decisions in this country, it is held, that one who enters upon land without color of title, has no constructive possession whatever, beyond his actual occupation, or *possessio pedis.*

But in this state a more liberal doctrine has long been maintained, and it is now settled, that where a person, without title, or color of title, enters upon a vacant lot, and actually occupies a portion of it, and the lot has a definite boundary, marked upon the land, such person, by claiming to be the owner to the boundary lines of the lot, has a constructive possession of the whole, and will acquire a title to the whole by such partial occupation for fifteen years, and such entry and claim give him a good prior possession of the whole, and a good title thereto against all the world, except the true owner.

The decision in the case of *Davis* v. *White*, 27 Vt. 751, explained and limited, and the principle therein enunciated, that a prior constructive possession must yield to a subsequent actual possession, denied, unless the subsequent actual possession be continued for a period of fifteen years.

Where a stone wall sixty-five rods in length, was built upon what the plaintiff's evidence tended to show was acquiesced in and treated as the division line between the respective farms of the plaintiff and defendant, the western terminus of the

wall being more than one hundred rods from the west end of the line between the two farms, and which was the line in controversy, and the jury were instructed that if they should find "that the wall was so constructed, and so far extended towards the west end of the farm as clearly to indicate or give notice to the public and all concerned, that the plaintiff claimed to exercise exclusive dominion over the piece of land in controversy, this would be evidence of a claim on his part sufficient to support a constructive possession by him over the same," it was *held*, that the charge was erroneous.

The decision in the case of *Buck* v. *Squiers*, 23 Vt. 495, explained and limited.

Where one of two adjoining proprietors accepts a warranty deed from the other of a piece of land, bounded by a definite line, he and his successors are thereby estopped from claiming that he was, at the time, holding adverse possession to a boundary beyond said line.

EJECTMENT for a parcel of land in Clarendon. Plea, the general issue, and trial by jury, September Term, 1864, Rutland County, KELLOGG, J., presiding.

The plaintiff and defendant were adjoining land owners. The territory comprising their farms formerly belonged to Dr. Silas Hodges. At the decease of Dr. Hodges certain lands belonging to his estate, in pursuance of his will, were divided by commissioners, one portion to his widow, and the remainder in equal portions to two of his sons and heirs, Silas W. Hodges, the father of the plaintiff, and Hannibal Hodges, the uncle of the plaintiff, which division was approved by decree of the probate court, in 1807. The plaintiff claimed title from his father by warranty deed dated March 11, 1851. The defendant derived his title through his father, Peleg Eddy, who was the grantee of said Hannibal Hodges, and a portion of the boundary line, as established by the deeds between the defendant's farm on the north and the plaintiff's farm on the south, appeared to be the same as that established by the division and decree of the probate court aforesaid. The length of the division line is upwards of three hundred rods, extending from Otter Creek westerly across an interval to the highway about one hundred rods, and thence westerly in the same direction up the hill and mountain to the west end of the farms, adjoining the Priest lot.

It appeared that the line across the interval and a portion of the way up the hill or pasture land, previous to 1807, was known as the line of the Clark lot, being the south line of a one hundred acre lot which Dr. Silas Hodges purchased of one Jedediah Clark in 1793,

and the division line of 1807 was run on the line of this Clark lot from Otter Creek west eighty-five rods, at which point the line of said division of 1807 turned southerly about eleven rods, and then proceeded west in the same range with the Clark line, but about eleven rods south of it, two hundred and forty-seven rods to the Priest lot. On the 28th day of April, 1819, Hannibal Hodges, by deed of warranty of that date conveyed this strip of land, called the eleven rod jog, to his brother, Silas W. Hodges, thus restoring the line of the Clark lot as the division line between the two farms. Peleg Eddy, the father of the defendant, derived his title by deed of warranty, dated April 25th, 1836, and it was conceded that the deed embraced all the land set by the commissioners in 1807 to Hannibal Hodges, except the eleven rod jog. In 1845, Peleg Eddy deeded the farm to the defendant and took a mortgage back to secure the purchase money.

It appeared that from a very early period there had been a fence between the farms from Otter Creek across the meadow or interval to the highway, which had stood where it now does so long as any of the witnesses could remember, and that it had always been recognized by the adjoining proprietors as the true division line. West of and adjacent to the highway, and extending across the division line there is a piece of swampy land, several rods in width, covered, until within a few years, with thick, tall timber, so as to obstruct the view of the line west of it. From the west side of the swamp the land begins to rise, and the ascent continues with more or less abruptness to the west end of the farms. The land has been cleared from a very early date, about one-third of the distance from the swamp to the west end, on both sides of the line, and used for pasturing. The remainder of the distance is woodland on the south, being the plaintiff's side of the line, and partly wood land and partly cleared on the north side of the line. On the pasture land west of the swamp there is about twenty-two rods of rail fence, then sixty-five rods of stone wall. Extending from the west end of the wall there is about thirty rods of pole or rail fence, to what is known as the old mountain road, which formerly crossed the line between the farms, and from the old mountain road to the Priest lot there is a brush fence. The plaintiff and his grantor had always occupied that portion of their

farm lying west of the highway and south of the division line as a pasture, the cleared and wood land being in one enclosure, the defendant and his grantees occupying their farm on the north side of the line in the same way, except as hereafter stated.

The defendant claimed title up to a straight line extended from Otter Creek, in the line of the Clar⊦ ⌐ ⌐ the west end. The plaintiff claimed title up to the fence before described ; the territory in dispute being a piece of land lying between the straight line aforesaid and said fence, and is about nine rods wide at the west end, and runs to a point in the swamp near the highway.

The plaintiff's evidence tended to show that the wall was built for Silas W. Hodges by one Colvin, in 1813 ; that when said wall was about to be built Silas W. Hodges and Hannibal Hodges met upon the ground and stuck stakes in what they called the division line, and directed the wall to be built upon it, which was done ; and that the wall stood where it was thus built until 1862, when it was rebuilt by the plaintiff. The defendant's evidence tended to show that the wall which was built in 1813 was not the same wall, but was intended to be built on the south side of the eleven rod jog, which, at that date, was the division line, and that it had been at some subsequent period removed to its present location. The stone wall, as it now stands, at the east end, is about one rod north of the line claimed by the defendant, and recedes farther from the line as it extends westwardly, so that the west end of the wall is more than two rods from the straight line.

The plaintiff's evidence further tended to show that in 1821 or 1822 there was an old log fence extending from the west end of the wall to the old mountain road, but that from the end of the wall it ran south, at right angles with the wall five or six or more rods, and thence ran west to the mountain road, and thence north five or six or more rods, on the east side of the mountain road, making the general range of the log fence the same as that of the stone wall, but several rods south of it ; and that this was superceded by a pole or rail fence sometime near 1830, placed in line with the wall ; that previous to the year 1821 a brush fence was built west of the old mountain road to the Priest lot, in general range with the stone wall, and that it had continued in the same place, with but slight varia-

tions, ever since; that it was built by the direction of Silas W. and Hannibal Hodges, upon the line as marked by them, which they called their boundary line; that immediately east of said mountain road and between that and a high bluff, which bluff is about one hundred rods east of the west end of the farms, the plaintiff and his grantor had tapped sugar trees four or five times; and also that wood and timber had been occasionally cut by them, on the disputed territory, but mostly fallen timber.

The plaintiff claimed that the stone wall, rail and brush fences had been treated as the division fence by the adjoining proprietors, and that he and his grantor had been in the exclusive and visible occupation up to said fences for a period of more than fifteen years, and claimed title by occupancy.

The defendant's evidence tended to show that there was no brush fence on the line between the farms west of the old mountain road until after 1830, when it was erected to protect grain fields on newly cleared land; and that it was not built with reference to the true line, but where it could be done most conveniently; that when first erected, it was several rods north of where it now stands, and that the defendant's father, and the defendant, had from time to time removed it farther south, and the trees on the north side had been cleared off, since the year 1836, and that it never was treated by the adjoining proprietors as a division fence.

The defendant's evidence further tended to show that soon after Peleg Eddy purchased his farm in 1836, the trees in the swamp were cleared off, so that the line could be seen from the meadow westerly where the wall and rail and pole fences were built; that there was a ditch in the line of the Clark lot on the meadow, which Silas W. Hodges, who then owned the plaintiff's farm, and Peleg Eddy desired to extend westerly towards the highway; that they met on the meadow for the purpose of staking it out; that it was then plainly to be seen that the fence and stone wall west of the swamp were not on a line with the ditch and fence on the meadow; that Silas W. Hodges said he knew the ditch and meadow fence were on the true line, and that it was the line of the Clark lot; that he said he knew the line was a straight line, between his farm and that of Mr. Eddy clear through to the Priest lot, and that the fence and stone wall were not on said

straight line; that it would not make any difference, as he did not claim any more than his deed entitled him to hold; and that when they rebuilt the fence, it could be placed on the true line between them.

No exceptions were taken by the defendant to the charge of the court in respect to the bearing or effect of the facts which the defendant's testimony tended to prove as aforesaid in regard to these declarations of Silas W. Hodges.

The defendant's evidence further tended to show that in the spring of 1850, Silas W. Hodges called upon Peleg Eddy, and the defendant, and desired them to sign a paper purporting to be an agreement not to claim a right of way over the mountain road, so called, across the land of Silas W. Hodges, by reason of using it as a wood road, which they signed; that on the occasion of presenting this paper for signature by Silas W., Peleg Eddy said he was not aware that title to land could be acquired by mere occupancy; and that if it was so, he must look after his south line at the west end of his farm adjoining the farm of Silas W.; that Silas W. then stated that he knew the fence between them was not on the true line; that he would not, and had not claimed title to any more land than his deeds covered, and that the papers would show where the true line was, and they would put the fence upon the true line, when they run it out, and wished to rebuild it; that upon Silas W. making this agreement with Peleg and the defendant, in the presence of witnesses, they signed said paper; that said agreement had never been revoked; and that the defendant, and his father so long as he had any interest in the premises, regarded it as binding and operative.

In accordance with the plaintiff's request, the court charged the jury that if they should find the plaintiff's grantor had been in the exclusive, open and undisputed occupancy of the territory on the south side of and up to said fence, claiming title thereto for the uninterrupted period of fifteen years, at any time before such agreement was made, as the defendant's evidence tended to prove, between Silas W. Hodges and Peleg Eddy and the defendant, this would give to Silas W. Hodges a good title to the land on the south side of, and up to the fence, and the agreement, being verbal merely, would not be operative to divest Silas W. Hodges of his title so acquired by occu-

Hodges *v.* Eddy.

pancy; but that if they should find on the other hand, that at the time such agreement or agreements were made, if made at all, no title had been acquired by occupancy, then such agreements were to be treated as having the force and operation of mutual licenses from each party to the other in respect to the occupancy of the land of each party by the other, which would be valid and operative, though not made in writing, so long as said agreements should be unrevoked; and that an occupancy by either party of the land of the other while such a license remained in force should not be treated as having any effect in establishing a title by possession or acquiescence.

The court also charged the jury, in accordance with the request of the plaintiff, that if they should find that the wall was built by the direction of Silas W. and Hannibal Hodges, and that it was agreed by them, to be upon the true line between them, and the adjoining proprietors actually occupied, under the said agreement, up to the wall, respectively, for a continuous period of fifteen years, then the plaintiff's grantor would acquire title by such occupancy to the line of the wall, even though the jury should find that, in making such agreement, Silas W. Hodges and Hannibal Hodges were mistaken as to the locality of the true dividing line between them, and neither of them supposed that he was occupying the lands of the other,—to which the defendant excepted.

And, in accordance with the further request of the plaintiff, the court charged the jury that if they should find that the wall was so constructed, and so far extended towards the west end of the farm owned by Silas W. Hodges, as clearly to indicate, or give notice to the public and all concerned, that he claimed to exercise exclusive dominion over the piece of land in controversy, this would be evidence of a claim on his part sufficient to support a constructive possession by him over the piece of land in controversy; but the court further instructed the jury on this point that what the wall did in fact indicate to an observer on the ground in this respect, and whether or not the wall was so constructed and extended as to give such a notice or indication to an observer on the ground, were questions of fact to be determined by the jury upon the whole evidence in the case, taking into account the length of the wall, and the distance

from its western end to the west end of the farm, and the apparent purpose for which the wall was constructed; and that the effect of the wall as a claim of the line of the land would depend mainly upon its extent as compared with the whole length of the line of the land, being of greater importance the farther it was extended, while if it extended only for a distance which was comparatively short, that is, as compared with the whole length of the line of the land, it should not be treated as such a distinct indication or evidence of a claim on the part of Silas W. Hodges of the line of the land beyond or westerly of the western end of the wall, as would be sufficient to support a constructive possession on his part over the piece of land in controversy. To this part of the charge the defendant excepted.

It appeared that, west of the old mountain road, there is a steep and high bluff extending northerly and southerly across the disputed line, and that from the top of the bluff to the west end of the farms, the land is much more level, and rises but very slightly. From the top of the bluff to the west end of the farms is nearly one hundred rods.

It further appeared that when the plaintiff rebuilt the wall in 1862, the defendant forbid him from so doing. The plaintiff testified that he did not know that the wall was not built in a line with the fence and ditch upon the meadow below, until the defendant called his attention to that fact, in 1862.

In the fall of the year 1862, the defendant built a pole fence commencing in the east line of the Priest lot about ten rods south of the north-west corner of the farm of the plaintiff as claimed by the plaintiff, and extending easterly on a line claimed by the defendant to be the true line dividing the farms, for a distance of about eighty rods, so as to inclose the land lying north of the new pole fence with the defendant's farm, all of the new pole fence being west of said high bluff, and cut timber or poles between the line of this new fence and the line of the old brush and pole fence north of it, with which to construct the new pole fence, and also removed the old brush and pole fence leading easterly from the north-west corner to which the plaintiff claimed, for nearly an equal distance; and this was the eviction complained of.

Verdict for the plaintiff. Exceptions by the defendant.

Hodges *v.* Eddy.

*D. E. Nicholson* and *Charles C. Dewey*, for the defendant.

I. The deeds make the division line *a straight line* from *Otter Creek to the Priest lot.* And as to the locality of the line, the fence and ditch on the meadow, without dispute, are upon it. It follows that the line called for by the deeds, is a projection of the line on which are the meadow fence and ditch, in the same direction, to the west end of the lot. Thus the paper title to the disputed territory is shown to be in the defendant; a fact conceded by the plaintiff, virtually; and assumed by the court in the charge. It was incumbent on the plaintiff, therefore, in order to recover, to establish, by proof, an actual adverse occupancy of the disputed territory for the period of fifteen years.

II. 1. But the defendant's evidence, uncontradicted in that particular, showed the fact, that the plaintiff's grantor, in 1836, admitted to the defendant's grantor, that the wall and fences west of the highway, were not upon the true line between them; but, that the line projected in range with the fence and ditch, on the meadow, was the true line; and that it was then agreed between them, that, when permanent fences should be erected, the true line should be established, according to the deeds, and the fences placed upon it, and that the agreement was renewed between the plaintiff's grantor, and the defendant's grantor and the defendant himself, in 1840, and never was revoked. 2. Under the charge of the court upon this branch of the case, it must be assumed that the jury, under the evidence, found that from 1836 or 1837 down to the time the plaintiff relaid the wall in 1862, the territory in dispute was occupied, *so far as it was occupied at all* by the plaintiff and his grantor, under said *license.* 3. But, assuming the *license* to be proved: the jury were *further* instructed, that if the plaintiff's grantor acquired title by adverse occupation *prior* to the *license,* it would be sufficient to establish the title to the *locus in quo* in the plaintiff; and the license being verbal merely, would not operate to divest Silas W. Hodges of the title thus acquired. It is the charge, in its various aspects upon this branch of the case, that is to be reviewed in this court.

III. In order to an intelligible understanding of the charge, in its application to the evidence, the following facts and circumstances should be particularly observed: 1. The utmost the plaintiff's evi-

dence tended to show, was, that the brush fence west of the old mountain road, and adjacent to the locality of the alleged *ouster*, was built in the fall of 1821 or the spring of 1822, while the defendant's testimony tended to show that it was not built until after 1830, and then constructed, as convenient, to protect grain fields on new clearings without reference to the true line; and that the fence had been often moved.    2. Until after 1825 the wall was not in line with any fence, *either above or below it.*    At its east end, the fence made a right angle to the south five or six rods, and there turned again to the east and ran down to the swamp, twenty-two rods.    *Through* the swamp to the fence and ditch on the meadow, there never was any fence, until recently.    At the *west* end of the wall, also, the fence turned south at nearly a right angle, and thence ran west about thirty rods, nearly *on the true line*, to the old mountain road, so called, and so remained until after the year 1825.    3. *As to acts of occupancy by the plaintiff and his grantor.*    The exceptions and testimony referred to, show them to have been unimportant and slight, west of the old mountain road; that only three or four instances of tapping sugar trees were shown, neither of which were proved to have been prior to the *license* to occupy in 1836–7; and that no trees were *ever* tapped west of the bluff, where the defendant made the entry complained of. The very few instances of chopping fallen timber were also east of the bluff, and no instances of cutting were proved prior to 1836–7. 4. Thus the jury may have found, as claimed by the defendant, under the evidence: 1st, That until after 1825, some thirty rods of log fence extended west from the west end of the wall, *but five or six rods south of it, and upon the true line as claimed by the defendant:* 2d, *That no brush fence west of the wall was built prior to* 1830: 3d, That *no wood was cut and no trees were tapped by the plaintiff or his grantor prior to the license* of 1836–7:   And yet have given a verdict for the plaintiff upon the naked ground of constructive possession, as indicated by the *pointing of the wall.*

IV.   There being no dispute as to the facts, the question as to whether they will support a constructive possession to land, *is purely one of law.*   It is only when material facts are in dispute that it becomes a mixed question of law and fact.   In this case, no facts touching the plaintiff's claim of title by possession, as supported

constructively by the location of the wall, and its relation to the land in dispute, were in question between the parties. It was error, therefore, to submit the *legal effects of the facts* to the jury. Washb. Real Prop. vol. 2, p. 491.

V. The charge was erroneous, because, *as matter of law*, the admitted and conceded facts do not, in any reasonable view, support a constructive possession of the land in controversy, as indicated by and depending upon the location of the wall. *a.* The definition of constructive possession is not to be overlooked. It is the antithesis of *actual* possession. It is that possession which is *not " actual, visible, open, notorious and hostile."* It is that possession which is deduced by " a mode of interpretation," a possession which is " inferred." *Blackstone. b.* Constructive possession is almost wholly unknown in England, and cases depending upon the doctrine are of rare occurrence in the English reports. It is a doctrine peculiarly adapted to, and has mainly grown up in the American states. The ordinary and usual method of supporting constructive possession is by entry, under a recorded deed, or other equivalent record of title, upon a portion of the premises described therein, which, in a new country is often all the owner can do, and the public record of the boundaries is held to be equivalent to actual occupancy of the whole and every part of the premises. *Chandler* v. *Spear,* 22 Vt. 404. We adduce, therefore, from the origin and reason of the law of constructive possession, that it is an enlargement of the strict rule of the ancient common law, *for the purpose of upholding the title of the real owner, and never to defeat it. c.* And it follows that the converse of the proposition is true, namely : *That the doctrine of constructive possession is never applied in aid of the possession of him who has no title, but is a wrong doer. d.* The right of such an one, is that which *Bracton* calls naked,—*nuda ;* when a person has no right, nor any spark of right, but only a bare placing of the feet ; *tantum nudam pedum possessionem. e.* All the well considered cases in the books evolve and sustain these propositions. It is sufficient to cite those, mainly, which support the proposition that constructive possession *is never applied in aid of the possession of him who has no title, but is a wrong doer.*

1. *Seizin, in the absence of possession,* follows the title in all cases,

unless there has been an actual ouster. And this is nothing but con-
structive possession, presumed in favor of the owner. *Langdon* v.
*Potter et al.*, 3 Mass. 215.

2. *As to adverse possession in the absence of color of title* requisite
to constitute a bar to the assertion of a legal title by the owner, it is
well settled that it must be "*actual, continued,* VISIBLE, *notorious,*
DISTINCT *and hostile,*" for the full statutory period. 2 Sm. L. Cas.
492. [*Vide Note to Taylor* v. *Horde.*] Or as stated by Mr. WAL-
LACE, "When one enters not under any deed or written title, but
merely assuming the possession with claim of right, the ouster he
effects extends no further than he *occupies, cultivates, encloses,* or oth-
erwise excludes the owner from." *Ib.* And such is the very defini-
tion of *oust : to take away from, to remove.* It implies *force,* and so
never can be effected *constructively.* And hence the quaint remark
of Lord HOLT, Salk. 246 : "A bare entry on another without an
*expulsion,* makes such a seizin only that the law will adjudge him in
possession that has the right; but it will not make a disseizin or
abatement without *actual expulsion.*" And also PARSONS, Ch. J., 4
Mass. 418 : "Where a disseizor claims to be seized by his entry
and occupation his seizin cannot extend further than his *actual ex-
clusive occupation,* for no farther can the party seized be considered
as *ousted;* for the acts of a wrong doer must be *construed strictly,*
where he claims a benefit from his own wrong." *Coburn et al.* v.
*Hollis,* 3 Met. 125 ; *Blood* v. *Wood,* 1 Met. 535 ; *Brandt* v. *Ogden,*
1 Johns. 155 ; *Kinciard* v. *Scott,* 12 Johns. 365 ; *Jackson* v. *Sharp,*
9 Johns. 109 ; *Jackson* v. *Schoonmaker,* 2 Johns. 232 ; *Brummer* v.
*Prop. of L. Whf.* 5 Pick. 135. And even constructive possession
under a deed will be restricted to such quantity of land as the person
in possession may be supposed to want for actual cultivation. *Chan-
dler* v. *Spear,* 22 Vt. 404. See also, *Exrs. of Stevens* v. *Hollister,* 18
Vt. 294 ; *Slater et al.* v. *Ranson,* 6 Met. 447 ; *Coburn et al.* v. *Hollis,*
3 Met. 125 ; *Poignard* v. *Smith,* 8 Pick. 272 ; *Smith* v. *Proctor,* 15
Mass. 495 ; *Hale* v. *Glidden,* 10 N. H. 397 ; *Ewing* v. *Burritt,* 11
Pet. 41 ; *Golson* v. *Hook,* 4 Strob. 23, 26 ; *Saxton* v. *Hunt,* Spencer,
487 ; *Wright* v. *Grier,* 9 Watts, 172 ; *Ralph* v. *Bailey,* 11 Vt. 521 ;
*Hubbard* v. *Austine,* 11 Vt. 129 ; *Doolittle* v. *Linsley,* 2 Aik. 155.

3. It is a corollary of the main proposition, that whenever the

acts of a supposed disseisor are *equivocal* in their nature, the presumption always is, that they are in accordance with, and not in hostility to the title of the true owner. Washb. Real Prop. 2d vol., p. 499.

VI. In view of the law of constructive possession, as thus shown, in respect to 1st, its origin ; 2d, its reason ; 3d, as illustrated in decided cases ; the charge of the court upon the question of constructive possession, as indicated by, and depending upon the location of *the wall,* was erroneous. *First,* Because it assumes that naked constructive possession may be invoked in aid of a wrong doer, without title, to defeat the title and seizin of the owner. *Second,* Because it assumes that the facts in relation to the location and extent of the wall towards the west end of the lot were in dispute, whereas they were *not* in dispute. *Third,* Because, the facts not being in dispute, the question as to whether *the location and pointing of the wall, alone considered,* gave the plaintiff title by reason of its constituting adverse occupation of the land in dispute, in the legal sense, was purely a question of law. *Fourth,* Because, as matter of law, the location and pointing of the wall did not constitute *"actual, continued, visible, notorious, distinct and hostile* possession" of the land in dispute, and did not exclude or oust the owner therefrom. Vide note to *Taylor* v. *Horde, supra. Fifth,* Because the jury were told, that a *mere claim* to the land in controversy, without actual possession, by the plaintiff, would be sufficient to enable him to acquire title *by adverse occupation* as against the real owner.

VII. The only case that can be cited in support of the charge is *Buck* v. *Squires,* 23 Vt. 498. And it is claimed, and is apparent, that the charge now under review, follows substantially the very language of the charge which was sustained by the supreme court in that case. 1. In *Buck* v. *Squires,* the territory consisted of a door yard and was all under the eye of an observer, and the line indicated by the uncompleted fence, was also supported by evidence of actual occupancy. Moreover, *how far* the fence was extended did not appear. The facts were in dispute. Hence there was apparent propriety in the instruction given to the jury. 2. But it is insisted that what is said in the charge in that case, in respect to constructive possession as indicated by the manner of occupation, is *technically* in-

accurate. *Constructive* possession in the *legal* sense, is the opposite of *actual* possession, and never can exist in the absence of *title, or color of title.* It is loose language, a confounding of legal phraseology and a jumbling of legal principles, to say that constructive possession may grow out of and be supported by the manner of occupancy, for when the manner of occupancy is such as to clearly indicate the extent of the claim of the occupant, the possession, in strictness of legal language, is *actual,* and not *constructive.*

VIII. At all events the charge was erroneous, because until after the year 1825 the plaintiff's occupation was restricted by an old log fence thirty rods in length, lying several rods south of the stone wall, in general range with it, but beyond it and on the line as claimed by the defendant; yet the jury were told that if in their opinion the *stone wall* indicated that the plaintiff *claimed* to exercise dominion to the west end of the lot, over the land in controversy, up to a line indicated by the wall, it was sufficient to give him such possession as in fifteen years would ripen into a title.

IX. Finally, the deed from Hannibal Hodges to Silas W. Hodges, of the eleven rod strip, so called, in 1819, was a recognition of the line as we claim it, and Silas W. and his grantees are estopped from claiming title acquired by possession, at any time prior to said deed. And the jury should have been so instructed.

*E. Edgerton* and *Daniel Roberts,* for the plaintiff.

I. A line between adjoining proprietors of lands acquiesced in as a division line for fifteen years, whether with or without occupancy, becomes thereby the true line, and cannot be disturbed. *White* v. *Everest,* 1 Vt. 181; *Jackson* v. *Van Corlaer,* 11 Johns. 123; *Beecher* v. *Parmele,* 9 Vt. 352; *Burton* v. *Lazell,* 16 Vt. 158; *Ackley* v. *Buck,* 18 Vt. 395; *Brown* v. *Edson,* 23 Vt. 435; *Clark* v. *Tabor,* 28 Vt. 222; *Holton* v. *Whitney,* 30 Vt. 405; *Baldwin* v. *Brown,* 16 N. Y. (2 Smith) 359.

II. The second branch of the charge is fully justified by *Buck et al.* v. *Squires,* 23 Vt. 495. That a fence may be so constructed, as, in connection with surrounding appearances, facts and circumstances, to clearly indicate a claim beyond it, is evident. The court could not say in this case, that this wall did *not* indicate anything in this respect; nor did the court instruct the jury that it *did* indicate any

thing in this respect; but left to the jury as a question of fact to say, whether the wall, under the circumstances, did "clearly indicate or give notice to the public and all concerned" of a claim to the land in question. *Ackley* v. *Buck*, 18 Vt. 395. In determining this question, the jury are referred to "the whole evidence in the case." As bearing upon the question, the jury would consider, among other things, 1, The character of the wall as to permanence, its extent, &c. 2, That it had been established by the former proprietors as being on the true line, and that occupation for fifty years had been according to it as a practical division fence, and the true line. 3, That the true line between the two lots was a straight line, and extended to the Priest lot. 4, That the wall as built excluded the defendant from the occupation of a part of the land he now claims, and that its extension in a straight line to the Priest lot answered the conditions of the question, viz: a common straight division line clear to the Priest lot. 5, The fact of the pole and brush fences leading on beyond the wall in the same direction, and as a continuation of that line, to near the Priest lot. 6. All those facts which the plaintiff's evidence tended to prove, if found by the jury, as that throughout the whole extent of the line for more than fifteen years, the occupation of the respective parties had been according to the fences.

If it be objected that this line should be a straight continuation of the one on the meadow, the answer is, this is not necessarily true, except in theory. If the commissioners of division actually ran the line as the plaintiff claims it, though it be a crooked line, this must prevail rather than any description.

*Again*, that the fence on the meadow is on the true line, is only matter of recognition and concession. But a like recognition and concession make the wall, &c., the true line on that part of the premises.

*Again*, to run a straight line to the Priest lot, you must continue on from the last direction; otherwise you must abandon some part of the established line.

III. A constructive possession beyond the limits of an actual possession is but a claim in some way indicated to an observer or an inquirer, as by indications upon the land, or by claim in paper, re-

corded or unrecorded. *Hunt* v. *Taylor*, 22 Vt. 556 ; *Buck* v. *Squires*, *supra ;* *Swift* v. *Gage*, 26 Vt. 224.

IV. The deed of Hannibal to S. W. Hodges in 1819 was no interruption of the adverse claim of S. W. Hodges. *Shepherd* v. *Hayes*, 16 Vt. 486.

The opinion of the court was delivered by

POLAND, Ch. J. The plaintiff and defendant are the owners of adjoining farms, and the title of each is conceded. The controversy between them relates wholly to the boundary or division line between their farms.

The strip of land lying between the two controverted lines is about nine rods wide at the west end, and runs to a point at the east end, where the two lines meet, and is over two hundred rods in length.

At the trial, both parties claimed that the land in controversy was embraced within their respective title deeds, and if the plaintiff had prevailed in establishing what he claimed in this respect, he would have been entitled to recover, for the defendant did not claim that he had occupied to the south line, to which he claimed, so as to have derived any title by possession to the land in dispute. But the plaintiff did claim, that if the strip of land in controversy, was embraced within the defendant's title deeds, that he and his predecessors in title had acquired a good title to it by adverse possession.

All the questions raised at the trial and brought here upon the exceptions, arise upon the plaintiff's claim to hold the land in dispute by virtue of his adverse occupation, and they are to be considered the same as if the record title had been conceded to be in the defendant, or had been found in his favor by the jury.

The plaintiff claimed that he and his father, Silas W. Hodges, under whom he claimed title, had actually occupied up to the line, to which he now claims, for a period of much more than fifteen years ; that the division fence was upon that line ; that it had always been claimed by his father and himself to be the true division line ; and had been acquiesced in as such by the defendant and his predecessors. The plaintiff's evidence tended to prove, that commencing at the point of divergence of the two lines, at the east end, and upon the

division line as claimed by him, there were twenty-two rods of rail fence, then sixty-five rods of stone wall, then about thirty rods of pole fence, and the remainder of the distance to the west end of the line, being more than one hundred rods, a brush fence. The plaintiff claimed that the piece of stone wall was built as early as 1813, and was placed upon the line, which was agreed to by the plaintiff's father and Hannibal Hodges, the former owner of the farm of the defendant; that the thirty rods of pole fence was built prior to 1830, in place of an old log fence which stood five or six rods farther south, and that the brush fence was built as early as 1821.

The plaintiff's testimony tended to prove that his father and himself had an actual possession of the land up to the line to which he claims, for a much longer period than fifteen years, and also that such line was acceded to and acquiesced in by the defendant, and all the former proprietors of his farm.

It does not appear that the defendant disputed the erection of the stone wall and the pole fence, at about the time the plaintiff claimed, but he attempted to prove that in 1836 the plaintiff's father, and the defendant's father, (who were then the owners of the respective farms,) agreed that the wall and fence were not on the true line, and that they should be removed and placed on the true line, when they rebuilt the fence.

. Under the charge of the court, on this part of the case, the jury must have found, either that no such agreement was made, or else that the plaintiff's father had already acquired a title by adverse possession up to that line, which the jury were told would make such a verbal agreement inoperative to divest him of.

But the defendant denied that there had ever been any brush fence erected upon the western part of the plaintiff's line; that there was any brush fence there at all till after 1830; and then was built to protect some newly cleared lands on the defendant's farm, without reference to any line; that it had been from time to time removed by the defendant and his father as they extended their clearing, and was never treated as the division fence by the owner of either farm.

The western part of the plaintiff's farm is uncleared land, and the only acts of possession claimed to have been done on that part of the land in dispute, were the tapping a few sugar trees four or five

---

---

times, and occasionally getting wood and timber from it, and that mostly fallen trees.

In 1862 the defendant erected a fence upon the west end of the division line, as he claims it, for the distance of eighty rods, thereby enclosing the disputed territory for that distance with his farm, and this was the eviction complained of, so that the case requires a special examination of the rights of the parties, and the proper application of the rules of law to the facts in relation to this part of the line.

The principal question arises upon the charge of the court, in reference to the effect of the stone wall, in giving the plaintiff a constructive possession to the same line upon which the wall stood, for the residue of the distance.

The court charged the jury by the request of the plaintiff, "that if they should find the wall was so constructed, and so far extended toward the west end of the said farm owned by the said Silas W. Hodges, as clearly to indicate, or give notice to the public, and all concerned, that he, the said Silas W. Hodges, claimed to exercise exclusive dominion over the piece of land in controversy, this woould be evidence of a claim on his part sufficient to support a constructive possession by him over the piece of land in controversy."

The court then proceeded to mention to the jury several considerations as to the force and effect of the indications afforded by the wall, as to what the plaintiff claimed beyond it, all very proper and judicious, provided the court were correct in the principal proposition.

In considering the correctness of this charge, it is proper first to ascertain what is meant by a *constructive possession.*

The phrase has come to be used in a very loose and indeterminate way, and perhaps judges have had quite as large a share in promoting inaccuracy in its use, as the less authoritative portion of the profession. We believe a correct definition of *constructive possession* is, *a possession in law, without possession in fact.*

What will give one a *constructive possession* of land, when he has not the actual possession? It is universally held that the owner of land, who enters into and holds possession of a portion of the land covered by his deed, and claiming under his deed, is by construction, and by virtue of his claim under his deed, legally in possession of all

that his deed covers, though he has not the actual possession of the whole. While he is thus in possession, no other person can gain or have a constructive possession of any part of his land, and he can be disseized in no other way than by an actual entry and occupation of another, and an actual occupation of any part of his land by one entering upon him cannot be extended beyond the portion occupied, by construction. There cannot be two constructive possessions of the same land at the same time.

There is but one mode in which the true owner of land can lose his constructive possession of his land covered by his deed, without being actually dispossessed. Where the owner agrees with an adjoining proprietor on a line of division between them, which is really within the true line, and withdraws all claim to the land lying beyond the agreed line, his constructive possession is limited to that, and the adjoining proprietor who claims to such line, has his possession extended by construction to the same line, and if such mutual claim and acquiescence is continued for the period of fifteen years, the title becomes fixed to that line upon both sides.

So where one enters upon an unoccupied lot under color of title, and actually occupies a part, claiming the whole, his actual possession is extended by construction to all that his deed covers, and if he continues such possession for fifteen years, he acquires a title not only to the part actually occupied, but to the whole lot. The term *color of title,* as it is used in the cases on this subject, means a deed or survey of the land, placed upon the public records of land titles, whereby notice is given to the true owner, and all the world, that the occupant claims the title. And it is on the same principle that it is held that, occasional entries upon land, cutting timber, &c., which ordinarily would be mere acts of trespass in a stranger, when done by one having color of title, are considered as acts of possession, because the true owner of the land has notice upon the public records that the person committing such acts claims a title to the land.

In the earlier decisions in this country it was held, (and I suppose the law to be held so still in New York and many of the other states,) that one who entered upon land without color of title, had

23

no constructive possession whatever; he could acquire no title by possession beyond his actual occupation, or *possessio pedis*, as it was termed.

But in this state a more liberal doctrine has long been maintained, and it is now settled, that where a person, without title, or color of title, enters upon a vacant lot, and actually occupies a portion of it, and the lot has a definite boundary marked upon the land, such person by claiming to be the owner to the boundary lines of the lot, has a constructive possession of the whole, and will acquire a title to the whole by such partial occupation for fifteen years, and such entry and claim give him a good prior possession of the whole, which is a good title against all the world, except the true owner of the lot. See *Crowell* v. *Beebe*, 10 Vt. 33; *Ralph* v. *Bayley*, 11 Vt. 521.

It is not improper in this connection to allude to the case of *Davis* v. *White*, 27 Vt. 751, which has created some confusion in the well settled law of this subject, and the effect of actual and constructive possession. The principle enunciated in that case was, that a prior constructive possession must yield to a subsequent actual possession. So that by that case, if A. enters upon a lot and occupies a part, claiming title to the whole, so as to have constructive possession of the whole, and B. subsequently enters and takes actual possession of that part not in the actual occupation of A., his right to the part thus taken possession of by him is better than that of A., and he cannot be expelled by A. The case was evidently decided upon some strange and sudden misapprehension, as no lawyer having the slightest knowledge of the subject, could have believed that to be the law, much less the very able and learned judges by whom the decision was made. The mistake was in not adding that the subsequent possession would prevail, if continued for fifteen years.

To apply these general views to the facts and charge in this case. The plaintiff claimed that he had actually occupied adversely up to the line he claimed, for more than fifteen years. The defendant claimed that on the western portion of the lot, where the defendant has now entered, that the plaintiff had never had any actual possession whatever.

The plaintiff claimed that the defendant and his predecessors had acquiesced in the line for the whole distance for more than fifteen years. The defendant claimed that as to the western portion of the plaintiff's line, it had not been acquiesced in. The plaintiff was not satisfied to rest his case with the jury upon his having obtained a title by actual possession to his line, and so set up this theory of a constructive possession, to aid him, if he failed in making out the actual possession.

It was only in case of failure to establish the *actual*, that he needed the aid of a *constructive* possession, and therefore the charge must be construed as if the jury found that the plaintiff had not established his title by actual occupation, so far as that was contradicted by the defendant's evidence. All this part of the case, as before stated, proceeds upon the theory that the defendant was the true owner of the land in dispute, and had only lost it by the adverse occupation of the plaintiff, or by his acquiescence in a mistaken and erroneous line. The defendant was in possession under his deed, and unless his constructive possession had been limited by his acquiescence in the erroneous line, (which his evidence tended to show had not been done,) he still had the constructive possession up to the true line, so far as it was not in the actual possession of the plaintiff.

The defendant might have lost his constructive possession, and even his land, by acquiescence in the plaintiff's line, but the charge on this point does not rest upon or make any reference to finding that the line extending west from the wall had been acquiesced in by the defendant, but wholly upon what the wall indicated as to the plaintiff's claim to the land and line west of the wall.

The existence of this wall upon a part of the plaintiff's line, and the occupation to it upon both sides, was an important piece of evidence, proper to be submitted to the jury, both in reference to the plaintiff's claim where the line was, and also as to the acquiescence of the defendant in the line for the whole distance, but whatever the jury might find it indicated as to the plaintiff's claim beyond, it would not give the plaintiff any constructive possession, by mere force of his claim, to any land covered by the defendant's title, Whether the defendant had lost his constructive possession by acqui=

escence was quite another question, and was made no element or condition to the constructive possession in the plaintiff, which the jury were put to find.

We are of opinion, therefore, that the charge in this respect was not correct, and, that if the jury found all that they were told they might find from the indications afforded by the wall, as to what the plaintiff claimed, it would not give him any constructive possession.

The language of the charge is borrowed mainly from what was said by Judge REDFIELD in *Buck et al.* v. *Squires*, 23 Vt. 498.

That case was very *different* from the present. The land in dispute was only a few feet in extent, and was almost enclosed by the defendant's fence, and would be entirely, by extending his fence a little farther in the same direction. The defendant made no continuous use of the place in question, but his occupation of it was occasional and furtive. When Judge REDFIELD says that the purpose and design of the defendant's fence gave him a constructive possession, it is evident he meant no more than this, that such claim of ownership and dominion, as the fence indicated, in connection with his acts done upon it, gave him a sufficient actual possession.

In relation to the agreement made between the father of the plaintiff and the father of the defendant, in 1836, to remove the fence, and place it on the true line when they should rebuild it, the court told the jury that if such agreement was made, still if they also found that the plaintiff's father, *at any time* before the making of such agreement, had fifteen years adverse possession up to the line the plaintiff now claims, he had acquired a good title to such line, and would not lose it by making such a verbal agreement.

The general correctness of such a charge is not denied. It appears from the case, however, that in 1819, Hannibal Hodges, the defendant's predecessor in the title, conveyed to the plaintiff's father by warranty deed, the narrow strip of land between their farms, extending the whole length of the present disputed line, and the plaintiff now claims that the north line of said " eleven rod jog" is the north line of his farm, or else that he has acquired land still north of that *jog* strip by adverse possession.

The acceptance of that deed by the plaintiff's father in 1819,

was in law a concession that Hannibal Hodges was the owner of the piece so conveyed, and by accepting a deed of this strip of land off the edge of Hannibal Hodges' farm, he precluded himself or his successors from claiming that they were then holding adverse possession to a boundary still farther upon the land of Hannibal Hodges.

The defendant now says that, as the jury were told that if they found that when said agreement was made in 1836, the plaintiff's father had, *at any time*, held adverse possession more than fifteen years, &c., then the agreement was inoperative ; they might have found all or part of such adverse use prior to the date of this deed in 1819.

For myself I do not think the question is properly presented or raised by the exceptions. No reference was made to the effect of this deed on the possession of the plaintiff as the case shows, nor was the attention of the court in any way called to it, or any ruling made upon it. Still more, there was ample time for fifteen years adverse possession between the date of that deed, and the time of said alleged agreement. But some members of the court think the question is presented, and that the instruction in the form it was given was erroneous. I quite agree that if the court did allow the plaintiff the benefit of any adverse possession prior to the date of that deed in 1819, it was wrong, and the defendant would have had a good exception if he had taken it. It is not material which is right as to whether the question is now properly before us, as the case is to go back for another trial.

Judgment reversed and new trial granted.