HORACE AUSTIN ET ALS. *v.* THE RUTLAND RAILROAD COMPANY, JOHN B. PAGE, EDWIN A. BIRCHARD, AND GEORGE W. BECKWITH.*

*Will. Deed. Tenants for Life. Remainder-men. Ejectment between Tenants in Common. Railroad Companies. Gen. Stat., ch. 28, §§ 17, 26. Riparian Proprietors on Lake Champlain.*

A will of all the testator's "estate, real and personal," will not embrace land of which the testator was in possession at the time of his death, but of which he had no title, or color of title.

And if one thus in possession of land, procures a deed thereof from another to his wife, the possession held by him thereafter, and by his wife after his decease, is to be referred to the apparent right acquired by such deed, and the color of title given thereby.

There is no privity between one in possession of land under a will, under color and claim of only a life estate, and one in possession after the termination of the life estate, under the same will, claiming in remainder. The remainder-man takes from the testator, not from the tenant for life. Hence the possession of the tenant will not inure to the remainder-man.

A testator willed that all his estate be equally divided, and that his two daughters each have a life estate in a moiety thereof—remainder to their heirs forever. *Held,* that on the termination of the life estates, the heirs of each took a moiety in remainder in fee.

*Held,* also, that the will contemplated, in the matter of determining the rights of the owners of the successive estates, that the division to be made should be such as the law provided for, unless made by the respective successive owners.

Tenants for life cannot make partition of the estate, binding upon those entitled in re mainder.

A railroad company, owning one undivided moiety of land in fee, [and the life estate of A. in the other moiety thereof, being in the exclusive possession, duly located their railroad thereon, and appropriated the whole thereof for the ordinary, necessary, and legitimate purposes of the road, and continued to thus use and possess the same after the termination of said life estate, to the exclusion of the remainder-men, and without the appraisal, or payment, of land damages under the statute, or otherwise, to the remainder-men. *Held,* that on account of the peculiar and extraordinary character of the subject-matter of the case, the remainder-men could not maintain eject ment against said company, to recover joint possession of said premises.

Sec. 17, ch. 28, Gen. Stat., contemplates that land may be taken for a railroad, and damage thereby sustained, before any appraisal of land damages shall have been made; and *semble,* that cases like the present were not intended to be subject to any of the provisions of the statute for the appraisal of land damages before the construction of the road.

Sec. 26 of the same chapter, affords a remedy in cases where a railroad company has taken possession of land for the construction of their road without paying the land damages, or having them appraised, and supersedes the common remedy by ejectment, which is available in ordinary cases between tenants in common.

Owners of land bordering on the waters of Lake Champlain, have no title to the soil beyond low water mark, nor right appurtenant, but only a statutory right, to build wharves and store-houses into the lake, in front of their land. Therefore, if land be made by a stranger by filling in earth in front of their land, from low water mark into the lake, and wharves and docks be built thereon, they cannot maintain ejectment therefor.

---

* This case was decided at the January term, 1872.

EJECTMENT to recover certain premises in Burlington. Plea, the general issue, with notice of special matter of defense. Trial by jury, April term, 1871, PIERPOINT, Ch. J., presiding.

The plaintiffs gave in evidence the original charter of Burlington, granted June 7, 1763, by which it appeared that said township was bounded west on " the shore of Lake Champlain," and was granted in seventy-two shares, of which one share was granted " for the benefit of a school in said town"; also, the proprietors' records of said town, by which it appeared that by a 7th division among the proprietors, water lot No. 10 was set to said school right, and was described as containing twenty rods of land, bounded on the north by the south line of South (now Maple) street, east by the west line of Water-street, being 50 links in width on said Water-street, and bounded " west by the waters of Lake Champlain." Water lot No. 9, by the same division, was set to the right of John Willis, Jr., one of the original proprietors. This lot is of the same size as No. 10, adjoins No. 10 on the south, and has the same western boundary. The plaintiffs' evidence, not contradicted, tended to prove that, early in the year 1800, the selectmen of Burlington leased to Richard Fittocks, " as long as wood grows and water runs," said water lot No, 10, at a rent of one dollar and fifty cents, payable on each first day of January thereafter, and that this rent had been annually paid by the successive occupants of said lot to the present date; that said Richard Fittocks went into possession under said lease, and built a dwelling-house and a store-house on the easterly part of said lot, and that his dwelling-house extended partly upon said lot No. 9 ; that he enclosed the easterly half of both said lots with a fence, and occupied what was within such enclosure as a garden and orchard, having filled in some part of No. 9 for that purpose, which was, before, low and swampy ; that his business during that time was unloading vessels with a large scow which he had in the lake there ; and that he occupied said lots in the manner stated until his death, which occurred August 17, 1810 ; that he left a will, which was duly proved, admitted to probate and recorded September 4, 1810, devising his estate therein as follows :

" I will that all my just debts and funeral charges be paid. *Item.* I will the one-third part of my estate, real and personal, to my beloved wife, Peggy Fittocks, during her natural life, in lieu of her dower, and that the residue of my estate, real and personal, be chargeable with the maintenance of my said wife, provided the said one-third part shall not be sufficient therefor, so long as she shall remain my widow. *Item.* I will that all my estate, real and personal, of every description, excepting what is above bequeathed to my wife, Peggy Fittocks, be equally divided, and that the use, improvement, and occupancy of the one moiety thereof, be had, held, and enjoyed, by my eldest daughter, Avis,— and the other moiety, by my youngest daughter, Nelly, during their natural lives ; also, that part above bequeathed to the said Peggy, in like proportions, after the decease of the said Peggy. Remainder, to their heirs forever ; and in case either of my said daughters shall die without heirs, her portion of my estate, real and personal, hereinbefore bequeathed, shall be held and enjoyed by the surviving daughter, under the same restrictions, subject to the same descent to her heirs, as hereinbefore set forth ; and in case both die during the lifetime of the said Peggy, without heirs, then the said Peggy shall have, hold, and enjoy, all my estate, real and personal, to her and her heirs forever."

The will and probate was not recorded in the clerk's office of of Burlington, until the year 1870. The plaintiff's evidence further tended to prove that the executors named in said will duly made and filed an inventory and appraisal of the estate of said Richard Fittocks, in which was set down and appraised the following real estate only, viz: "$13\frac{1}{2}$ acres of land at Red Rock Point," appraised at $270, and " Water lot laid to school right, subject to rent at $1.50 a year, with house and store-house on same," appraised at $250, and the probate records produced, showed an order of the probate court for the sale of the real estate for the payment of the debts of the estate, and the sale by the executors, under that order, of the real estate at Red Rock Point ; and showed the whole of the inventoried estate, except said water lot No. 10, to have been administered and disposed of, and the debts paid, and the accounts of the executors settled, November 7, 1820, leaving a balance in favor of the executors, which they remitted to " the widow and heirs, from benevolent motives" ; but no further mention was made of said water lot No.

29

10, except as above referred to in said inventory and appraisal, nor was any mention made of said water lot No. 9, nor were any proceedings had in the probate court in reference to either of said lots ; that upon the death of said Richard Fittocks, the said Peggy Fittocks, widow, remained and continued to live upon said premises, and the said daughter Avis, having married one Reuben Raxford, went with him into the occupation of the same, occupying the house which Richard Fittocks in his lifetime had built, —the said Peggy Fittocks and Mrs. Raxford living together,— and that the said daughter Nelly, having married one Rufus Austin, went with him into possession of said lot No. 10, he occupying with his buildings the west half of said lot, and also enclosing and occupying the west half of said lot No. 9 ; that said Rufus Austin died about twenty-two years ago, and the said Nelly Austin died January 5, 1870, leaving as their children surviving them, the ten principal plaintiffs named in the writ, and that the female plaintiffs named in the writ, were the wives of the other named plaintiffs, as in the writ described.

It appeared that the said Avis is still living, and is a widow, her husband having deceased many years ago, and that the said Peggy Fittocks died in the year 1827.

The plaintiffs then offered in evidence a certain partition deed, dated April 17, 1824, ( duly executed, acknowledged, and recorded), between the said Rufus Austin and Nelly ( in the deed called Eleanor ) Austin, of the one part, and the said Peggy Fittocks ( in the deed called Peggy Chance ) and said Reuben Raxford and Avis Raxford, of the other part, purporting to divide said water lot No. 10 between them. To the admission of this deed, the defendants objected for substance, but the court admitted the same, and it was read in evidence.

The plaintiffs also introduced in evidence a deed of said Rufus and Eleanor Austin, to Jireh Durkee, of part of water lot No. 10, dated October 14, 1825, acknowledged and recorded. Also, a mortgage deed of said Rufus and Eleanor Austin of another part of the same lot, to Henry Mayo and Timothy Follett, dated April 24, 1827, acknowledged and recorded.

These two last named deeds were in the defendants' chain of title, but were introduced by the plaintiffs for the purpose of showing that water lot No. 10 was therein described as a school lot, the original lease and the record thereof being proved to have been lost, and other evidence having been given of the fact by the plaintiffs, not material to be stated.

It was conceded by the defendants, that the defendant Beckwith was in possession of the dock in the declaration described, lying in front of said two water lots, and extending into the lake, and that the other defendants were in possession of the rest of the premises described, and that the Rutland Railroad Company was the landlord of said Beckwith as respects said dock; such possession and title, or claim of title, being as hereinafter set forth.

The plaintiffs gave evidence tending to show a demand of the premises in question, of the defendants, before suit brought, which is not material to be more particularly stated, under the ruling of the court. Upon this evidence the plaintiffs rested their case.

The defendants then put in evidence the charter of the Champlain & Connecticut River Railroad Company, granted November 1, 1843, and the act of 1847, changing the name to that of the Rutland & Burlington Railroad Company, and the location and survey by the directors of said corporation, as by them signed, sealed, certified, and recorded in the town clerk's office of said Burlington, dated January 24, 1846, of lands embracing said water lots 9 and 10, "for depot purposes, and other purposes connected with the northern termination of said railroad," and introduced in evidence tending to show, that said railroad was constructed at this point in the year 1848, and through its whole length by December 25, 1849, and that, ever since, said two lots had been used by said railroad company, and its successors in the management and control, for depot purposes, and other purposes connected with the use of said railroad,—having, during all this time, several railroad tracks crossing the same, and connecting thereby with the Vermont & Canada, or Vermont Central Railroad, proceeding north and east. It was not claimed by the defendants that any appraisal of the lands so taken had been made, nor that the

plaintiffs had ever received any compensation therefor, but that said railroad company had, after such location and survey, purchased and taken conveyances of said premises from other parties, as hereinafter stated, who were supposed to have title thereto.

All the plaintiffs, at the time of such location and survey, were, and have ever since been, residents without this state. Some of them were then minors, and some were of full age.

As tending to prove the knowledge of the plaintiffs, of such appropriation by said railroad company, and the acquiescence of the plaintiffs therein, the defendants relied upon the publicity and notoriety of the proceedings, and of the occupation of said premises for the purposes aforesaid, and upon said record in the town clerk's office, and upon the testimony of Horace Austin, one of the plaintiffs, who, on this point, testified in substance, that it was seventeen years ago last fall that he first heard that the Rutland & Burlington railroad was laid upon these lots, and that he heard of it from his folks in Michigan City, when he returned from the army, and had moved to the West ; that he heard of the railroad being built at that time, from Mary Ann Dupew and Adam Smith, the daughter and son-in-law of his aunt, Mrs. Raxford. That Timothy Follett, somewhere about the time that Mrs. Raxford conveyed to the railroad company, wrote a letter, either to him, or to his sister, Mrs. Nelson ( who was the oldest heir ), wanting to know what they would take for the land, but did not state for what purposes he wanted it ; and that either he or his sister answered the letter, saying that some of the heirs were not of age, and could not sell it.

The defendants also introduced in evidence a deed from John Collard to Peggy Fittocks, dated April 29, 1805, conveying to her in fee, with warranty, in consideration of five dollars, the " one moiety or equal half of water lot No. 9, laid and drawn to the original right of John Willis, Jr.," with evidence that said Richard Fittocks paid Collard for it. Also, the quit-claim deed of said Peggy Fittocks to Timothy Follett, dated January 13, 1827, of all her title and interest in the same lot. Also, the warranty deed of John Collard to John Pomeroy, dated July 4, 1825, conveying in fee the other undivided half of said lot No. 9. Also,

the quit-claim deed of John Pomeroy to Henry Mayo and Timothy Follett, dated April 17, 1827, conveying in fee all his right and title in the undivided moiety of said lot No. 9. The defendants, relying in their own behalf upon the two deeds put in evidence by the plaintiffs, viz: Rufus and Eleanor Austin to Jirch Durkee, dated October 14, 1825, and the mortgage deed of Rufus and Eleanor Austin to Henry Mayo and Timothy Follett, dated April 24, 1827, also put in evidence the quit-claim deed of Jirch Durkee to said Mayo and Follett, dated June 27, 1828, conveying all his title and interest in said water lot No. 10 to them. Also, the deed of said Mayo and Follett to Harry and John Bradley, dated February 26, 1835, conveying to them said water lot No. 9, and "the westerly half of water lot No. 10," with warranty, except as to the said annual rent chargable on No. 10. Also, a deed of said Harry and John Bradley to Timothy Follett, dated April 25, 1835, of one undivided third part of the same premises with warranty. Also, a quit-claim deed of said Harry Bradley to said Timothy Follett and John Bradley, dated January 25, 1841, of all his right and title in the same premises. Also, the deed of said Timothy Follett and John Bradley to the Champlain & Connecticut River Railroad Company, dated September 13, 1847, conveying sundry lands, and among them, said water lot No. 9, and "the westerly half of water lot No. 10," for the consideration received, as expressed in said deed, of seven thousand dollars, with warranty, except as to the annual rent on said lot No. 10. Also, the quit-claim deed of Avis Raxford (then a widow) and her children, viz: Daniel A. Smith and his wife Sophia, Mary Ann Dupew, Dennison Raxford, Nelson Raxford, and Margaret Raxford, to the Rutland & Burlington Railroad Company, dated September 11, 1849, conveying, for the consideration of $3850, as expressed in said deed, all their right and title in and to "water lot No. 10, so called, on the west side of Water-street, with the buildings thereon; also, water lot No. 9, adjoining said No. 10, in the village of Burlington." All the foregoing deeds were duly acknowledged and recorded.

It was conceded that the title, and all the rights of the Rutland & Burlington Railroad Company, had, before the commence-

ment of this suit, passed to, and become vested in, the Rutland Railroad Company, and that the control and management of said railroad, and the rights of said several corporations, had, for the purpose of such management and control, become vested in the defendants, Birchard and Page, as trustees of the second mortgage bondholders of said Rutland & Burlington Railroad Company, by due appointment of the court of chancery. It was also conceded that two of the plaintiffs, children of Rufus and Nelly Austin, were born previous to April 17, 1824.

The defendants' evidence, not contradicted, tended to prove that Mayo, Follett, and the Bradleys, had claimed and occupied the westerly half of No. 10, and of No. 9, from the time of their purchases down to the time of the conveyance by Follett and Bradley to the railroad company; and it was not claimed by the plaintiffs that the said Rufus and Nelly Austin, or Mrs. Raxford, or her children, ever occupied or claimed any part of the premises in question after the date of their repective conveyances.

The defendants then offered to prove that the shore line of Lake Champlain, and the line of low water mark, during the life, and at the death, of Richard Fittocks, was at a point ten rods distant from, and west of, the west line of Water-street, and was at those dates, and ever since, until the building of said railroad, the western boundary and limit of said water lots Nos. 9 and 10; and that in the construction of said railroad, and for the laying of necessary tracks, the Rutland & Burlington Railroad Company had filled in with earth, to the west of said ten rods distance, and into the lake, a distance of 110 feet; and that said Beckwith, defendant, had, at large expense, under a lease and contract from the other named defendants, and by their license, built and extended still further out into the lake, the said dock, from the point to which said railroad company had so filled in as aforesaid. This evidence was objected to by the plaintiff, and the court excluded it.

Upon the whole evidence, the plaintiffs claimed as follows;

1. That the plaintiffs' title to the one half of lot No. 10, was clear.

2. That the half which the plaintiffs were entitled to recover, was the westerly half, according to the partition deed of April 17, 1824.

3. That the question of the nature, extent and character of the possession of so much of lot No. 9 as was shown to have been occupied by Fittocks and his successors, should be submitted to the jury, and that if found to be exclusive, continuous, under a claim of right, and enclosed by a fence, as the plaintiffs' evidence tended to show, the plaintiffs were entitled to recover one half of so much of lot No. 9 as was so occupied.

The court ruled that, upon the evidence, the plaintiffs were not entitled to recover any part of lot No. 9. To this decision the plaintiffs excepted.

The defendants claimed:

1st. That the plaintiffs were not entitled to recover in the action.

2d. That if entitled to recover, they could recover only the one undivided half of lot No. 10.

3d. That no recovery could be had for the land extending into the lake beyond the boundary of lot No. 10, as it existed at the time of the death of Richard Fittocks, so far as said extension had been made by the works of the Rutland & Burlington Railroad Company.

4th. That no recovery could be had for any part of said dock.

Neither party desiring to address the jury, and neither party questioning the truth of the evidence of the other, so far as lot No. 10 was concerned, the court ruled that the plaintiffs were entitled to recover, and directed the jury to return a verdict for the plaintiffs, the damages in that event being agreed upon, for the seisin and possession of so much of said water lot No. 10 "as lies west of a line parallel with Water-street, and one chain and thirty-six links westerly from said Water-street, together with the dock, or wharf, lying opposite and against said water lot No. 10, and of the same width therewith, and one cent damages and costs." The jury returned a verdict accordingly.

The defendants excepted to the several rulings of the court in the admission of evidence by them objected to; to the exclusion of the evidence by them offered; to the refusal to rule upon the case as by them requested; and to the rulings as made.

*Daniel Roberts*, for the defendants.

I.   On the plaintiff's exceptions as to No. 9.

Upon the plaintiff's evidence, Richard Fittocks, some time in the year 1800, took possession of lot No. 10 under his town lease, and in putting up his buildings upon the easterly part of No. 10, then or later, extended them partly upon lot No. 9, and enclosed the easterly part of both lots with a fence, and so occupied the east part of both lots.   This occupation of No. 9, upon the plaintiffs' evidence, was without title, or color of title, and, we might suppose as a fact, came through a mistake as to the boundary of No. 10.   It continued but ten years at most, as he died August 17, 1810, and so did not ripen into a perfect title.

1st.   The plaintiffs cannot, in their behalf, add to this the possession of the life tenants, Avis and Nelly, so as to make out a fifteen years adverse possession.   *Gourley* v. *Woodbury et als.* 42 Vt. 395.   These plaintiffs are not the successors of Avis and Nelly, do not claim through them, but by an independent title, each party taking a separate estate, and directly from the will of Richard Fittocks, as purchasers.   No tenure exists between them.   Wms. Real Prop. 188; 2 Wash. Real Prop. 231, 493.   Nor trust —Law Rep. 6 Ch. App. 32.

The estate of these plaintiffs under the will, was a vested remainder from the start.   2 Wash. Real Prop. 230, 231 ; *Blake et ux.* v. *Stone,* 27 Vt. 475 ;   *Gourley* v. *Woodbury et als. supra.* The continued possession of the father and mother of the plaintiffs, therefore, if it could grow to a title, would become a title for themselves, and not for the plaintiffs, and could not enure to the benefit of the plaintiffs as claimants under the will.   Their possession, being under claim of title as tenants for life, however long enjoyed, could perfect it only as an estate for life, as their possession must be referred to their claim.   They must first repudiate their title under the will, before their possession could begin to count as a claim in fee.   Again, the plaintiffs do not claim as heirs of Nelly, but by purchase under the will, and so the claim is inconsistent with any title in fee in Nelly, created by fifteen years adverse possession.

2d.   Whatever right such possession of the life tenants created, passed, 1st, by the deed of Rufus and Nelly Austin to Durkee, October 14, 1825, and thence to the defendants; 2d, by an adverse possession of No. 9 from thence down.   Whatever was gained by an adverse possession by the life tenants, was lost by the subsequent counter possession since 1825.

3d.   The possession of Richard Fittocks of No. 9, must be referred to the title of his wife Peggy, under the deed of Collard, of April 29, 1805; and the subsequent possession of herself, and of the life tenants, down to January 13, 1827, when she conveyed to Follett, must be referred to the same title.   Richard Fittocks paid Collard, and consented to the deed being given to her.   Fittocks' possession must be presumed to have been under an apparent right, rather than without right, and no other right appears. That his possession may have commenced before the date of this deed (if it did), consists with a holding under it.   *Brooks* v. *Chaplin*, 3 Vt. 281.

4th.   These facts also amount to a recognition of the title of John Collard to No. 9, through whom the entire estate in undivided moieties has come to the defendants, and estops the plaintiffs, claiming under the will, from denying it.   *Hodges* v. *Eddy*, 38 Vt. 327.

5th.   The course taken with No. 9 after the death of Richard Fittocks, shows that it was not understood to have been claimed or possessed by him, except in right of his wife.   It was not inventoried nor administered as any part of his estate.   It was thereafter possessed by his widow until 1827, when she conveyed it to Follett.

II.   Defendants' exceptions.

1st.   That plaintiffs were not entitled to recover.   For the present, let it be assumed that the plaintiffs were entitled to an equal undivided half of lot No. 10.   If any one of the plaintiffs was not entitled to recover, then this suit must fail.   Some of these plaintiffs were of full age at the date of the location and survey of the railroad.   All were then, and ever since, residents without the state.   This corporation was made subject to the general railroad laws by act of November 9, 1850.   Sess. Laws, p. 87.   See

30

Charter 1843, p. 53. The interest of the plaintiffs as a vested interest in remainder, was susceptible of estimation and appraisal. Gen. Stat. ch. 28, § 20; Comp. Stat. ch. 26, § 24. The setting out of the land for depot purposes, and the survey of the railroad route, with the record thereof, were something more than a possession taken in the way of a survey, &c., as preparatory to an appropriation of the land. It was an appropriation of it, and of the whole title in it, for the purposes of the charter. This was notorious. It was on record, and some of the plaintiffs had actual notice. Seeing this, and not objecting, an assent should be implied, which cannot be revoked. *McAulay* v. *Western Vt. R. R. Co. et al.* 33 Vt. 311; *Knapp et al.* v. *McAuley et als.* 39 Vt. 275; *Troy & Boston R. R. Co.* v. *Potter*, 42 Vt. 265, 272.

Nor are the plaintiffs harmed by this rule; for their rights to full damages are reserved to them, and secured by a specific lien upon the lands. Charter, § 7; Gen. Stat. ch. 28, § 17; Comp. Stat. ch. 26, § 20. So too, an action is given by statute to recover full damages when the lands have not been appraised. Comp. Stat. ch. 26, § 30; Gen. Stat. ch. 28, § 26. Again, it may be said that the acts of the railroad company were lawful as to these plaintiffs, or that the plaintiffs had no right to complain of such acts, until after the expiration of the life estate of Nelly. On this theory, the present use of these grounds is lawful to the railroad company, as an owner of the other undivided half. These works were not only rightfully erected, but rightfully continued. The action then is based upon the claim that the plaintiffs are entitled to be admitted to a joint occupation with the railroad company, of these tracks and depot grounds, and that the action of ejectment lies upon the refusal of the company so to admit them. But the possession of the company must be exclusive, for the sake of the public, and cannot be shared with any one else. *Troy & Boston R. R. Co.* v. *Potter, supra,* and cases cited.

2. The court erred in giving effect to the partition deed of April 17, 1824, of the life tenants in behalf of the remainder-man, against the defendants' second request. The case shows that some of these plaintiffs were then in life. The remainder was then vested in them, as children, taking under the denomination of

" heirs."   The contingency which applied to unborn children, be-
came a certainty at their birth.   *Blake et ux.* v. *Stone*, 27 Vt.
*supra; Smith* v. *Hastings*, 29 Vt. 240.   It is admitted (and the
plaintiffs' case rests upon this) that the life tenant's could do noth-
ing to the prejudice of the remainder-men.   Otherwise, the deed
of Austin and wife conveyed the plaintiffs' estate in the west half
of No. 10, which was conveyed as a fee.   By the same reason,
the remainder-men cannot avail themselves of any attempted
change in their relations, which might prove to their advantage ;
and it is absurd to say that this may depend upon the election of
the remainder-men, and particularly, as in this case, where a part
might elect differently from the other part.   The title of these
plaintiffs was an undivided interest, each for himself, in the entire
lot.   It was not competent for the life tenants to change this.   The
partition deed did not profess to do this, nor to bind the remain-
der-men.   It was a mutual quit-claim of the interest of the parties
to it, and of their interest only, viz : their life-estate.

   The provision in the will as to a division into moieties, has no
force to command an actual division and separation into parcels.
Avis and Nelly could do this, or occupy in common, as they
should see fit.

   Much less does the will contain an authority to Avis and Nelly
to make such a division for their children, and such as should
bind their children.   If any such practical division is enjoined, it
is only to regulate the " use, improvement, and occupancy "
during the lives of Avis and Nelly.   " Remainder to their heirs
forever," means, remainder of my *estate* in the entire parcel.

   But suppose this will contemplates an actual division in sever-
alty, and that the testator intended that such actual division
should be made in advance of the capacity of the remainder-men
to enjoy the estate, and perhaps before their birth, and that such
division should nevertheless bind them ;   then there is no author-
ity given to Avis and Nelly to make that division, and unless such
authority was given, it does not exist.   The law had provided
other modes.   Stat. 1797.   Slade's Stat. 152.   Probate Act of
1797.   Revision of 1807, p. 127.   And to these other modes,
this provision of the will must be referred.

III. As to the land made by the railroad company, and the dock.

This land and dock were outside the chartered limits of Burling-ton, and outside the limits of No. 10, as specifically given. The bottom of the lake is the property of the state, and not of any indi-vidual. *Fletcher* v. *Phelps*, 28 Vt. 257. And No. 10, as it has come to the plaintiffs, is No. 10 as it existed at Richard Fittocks' death, adding only the natural accretions. The riparian owner has not, at common law, any peculiar rights in the shore of navi-gable waters. *Rex* v. *Smith*, Doug. 441 ; *People* v. *Tibbetts*, 19 N. Y. 523 ; *Gould* v. *Hud. R. R. Co.* 6 N. Y. 522 ; *Lansing* v. *Smith*, 8 Cow. 146 ; S. C. 4 Wend. 9 ; *Paterson & Newark R. R. Co.* v. *Stevens*, Law Reporter for March 1871, p. 165 ; 3 How. U. S. 312 ; *Pres't. &c. of Harvard College* v. *Stearns*, 15 Gray, 1.

The statute has given a *jurisdiction* to the bordering towns, over the waters of the lake, but has not extended the territorial boundary. Gen. Stat. ch. 15, § 80 ; *Corinth* v. *Newbury*, 13 Vt. 496, 500. It has extended no man's boundary into the lake, nor allowed him to go beyond his boundary upon the state's land, except upon the condition that he may have erected a wharf, &c., and extended it from his land into the lake. Gen. Stat. ch. 64, §§ 5, 6, 7. And " the exclusive right to the use, benefit, and control of such wharf, &c.," is limited to him who may have " *erected*" it, his heirs and assigns. Sec. 7. The right of the shore-owner, under this statute, to build beyond his boundary into the lake, is but a franchise at best, or *right to build*. If interfered with, an action might lie for a disturbance of the right, but not ejectment. In this case, the artificial extension into the lake be-yond the original boundary of No. 10, by the railroad company, was by the state's license, and was lawful, as was the building of the dock still further into the lake. These works having been built at great expense, and rightfully, it cannot be that ejectment will lie by these plaintiffs, to be admitted into a joint possession, without even offering to contribute to the cost of the works.

Whatever rights the plaintiffs may have in respect to this made land and the dock, if any, is matter of equitable adjustment upon a bill of equity. *Again,* this made land, over which the

railroad passes, at the time of the grant of the charter being the property of the state, the charter gave the railroad company the right to pass over it. The land of no private person was taken by this appropriation, and hence there was no occasion for an appraisal of damages. The right given by the statute to the riparian owner to erect wharves, &c., was but a license, adding nothing to the territorial boundaries of the shore-lots, nor adding anything to them as property. As a license, before being acted upon, it was revocable, and was, in legal effect, revoked by the charter and the building of the railroad under it. See cases above cited.

The charter provides that compensation shall be made for the lands " entered upon and used," to " the owners." If the state was the owner, then the plaintiffs were not entitled to compensation. Unless the plaintiffs' land was taken, they were entitled to no damages for any consequential injury. *Hatch* v. *Vermont Central R. R. Co.* 25 Vt. 49 ; S. C. 28 Vt. 142.

The first general act giving authority to erect wharves extending into the lake, was the Revised Statutes of 1840. This, in form and terms, is but a license. Before that date, the state had, from time to time, given special license for the same purpose. In 1802, to the Burlington Bay Wharf Co., the exclusive privilege, for 25 years, " of erecting and continuing at Burlington Bay, between the points known as Red Rock and Sharp Shin, a wharf and storehouse." Acts of 1802, p. 193 In 1825, to Messrs. Keyes, of Highgate, the right of extending a wharf " into the waters of Lake Champlain, or Missisquoi Bay, not exceeding 400 feet from low water mark." Acts of 1825, p. 138. Like grants in 1826, to John S. Larabee, of Shoreham, and Calvin Perry, of Swanton. Acts of 1826, pp. 52, 53. The granting of ferry privileges upon the lake, indicates the state's control over the lake. Storehouses and wharves were first made taxable in the towns adjoining such wharves, in 1823. Slade's Stat. 399.

Whatever rights have been accorded to the riparian owner in this country, beyond what the common law gives, stand upon local usage and custom, or legislative grant; as in Massachusetts, upon a colonial ordinance of 1674. 2 Dane's Abr. 693, *et seq.* ;

*Storm* v. *Freeman*, 6 Mass. 435. In Connecticut, upon an old custom. 7 Conn. 202; 25 Conn. 352. And so in New Jersey. *Railroad Co.* v. *Stevens, supra.*

But this is but an inchoate right, and, as a pure license, revocable. And so it stands under our statute, as under a like statute in New Jersey. *Railroad Co.* v. *Stevens, supra.*

*Wm. G. Shaw* and *E. J. Phelps*, for the plaintiffs.

I. Neither the location and survey of depot grounds by the directors of the Rutland & Burlington R. R. Co., nor the occupation of the premises in question by the railroad company, had any effect upon the rights of the plaintiffs. No appraisal of the land covered by the survey, was ever made; no money was ever paid, tendered, or deposited for the owners of the land; but the railroad company elected to hold the land, not by sequestration and appraisal, thereby taking merely an easement in the land, but by a supposed purchase of the fee by deed, from those whom they erroneously supposed to have the title.

The deed of Follett & Bradley, who held an estate in the Austin portion of the lands, only for the life of Eleanor Austin, affected in no degree the right and title of Eleanor Austin's children. That deed conveyed only such title as Follett & Bradley possessed, viz: a life-estate. The plaintiffs' title, then, did not pass to the railroad company by Follett & Bradley's deed. When the title is not conveyed by deed, payment of land damages is a condition precedent to the acquiring of title by the company, except when such condition is waived by the land owner. *McAulay* v. *Western Vt. R. R. Co.* 33 Vt. 311; *Knapp* v. *McAulay*, 39 Vt. 275. The plaintiffs never waived their right to such payment. They were all non-residents, some of them were minors, and it does not appear that more than one of them knew of the occupation of the land by the railroad, previous to the commencement of this action, and that one did not hear of it till 1853, and then, only at the West, as a matter of hearsay. No notice of the fact was given them, nor any communication on the subject had with them by the railroad company. Moreover, they had no title upon which they could make a claim, or interfere with the posses-

sion of the company, until their mother's death in 1870.    The railroad company possessed their mother's title, and during her lifetime, they might do what they pleased with the land, provided they committed no waste.    This case bears no analogy in .fact to the McAulay cases, above cited.

II.    Having lost nothing by waiver of the payment of land damages, it is clear the plaintiffs have title in fee to some portion of lot No. 10, and the question is, are they tenants in common of the whole lot with the Rutland R. R. Co., each owning an undivided interest, or do they own in entirety and severalty the western part of the lot ?    We insist that they are the sole owners of the western portion.    The will of Richard Fittocks provides that his estate shall be equally *divided* into two moieties, one moiety to go to his daughter Avis for life, and the other, to his daughter Nelly (Mrs. Austin) for life, *remainder to their heirs forever.*

The *division* of his estate was provided for by him, and was to precede the use and occupancy by his daughters, of their respective shares.    He did not intend that his daughters should take *undivided* shares, and be tenants in common ; but he required a partition of his estate, which is certainly inconsistent with a tenancy in common.    This division he intended should affect, not only the title of his daughters, but also of their heirs ; the share which each took for life, was to go in fee to their heirs ; the grandchildren were to have only that divided part which their respective mothers took.

Adopting the other construction, if Mrs. Raxford left but one child, and Mrs. Austin, ten, the Austin children would take ten elevenths of the fee, and the Raxford child but one eleventh.    Indeed, if the construction prevails that the plaintiffs take only an undivided interest, as the case shows that Mrs. Austin has left ten children, and Mrs. Raxford has but five, we claim that the plaintiffs are entitled to recover ten undivided fifteenth parts of the lot. If the heirs do not respectively take the fee of the parts of the lot in which their mothers have had their life-estate set out, they must take the remainder *per capita* and not *per stirpes*.    But the error of this construction is plain, because, under it, supposing

Mrs. Raxford and her children had not conveyed their title, what title would the plaintiffs take after their mother's death, their aunt Raxford still surviving ? They could not be tenants in common with Mrs. Raxford, because her interest is but for life, and covers but the eastern portion of the lot, while theirs would be in fee. They could not be tenants in common with Mrs. Raxford's children, because the latter would have no right whatever to the premises during their mother's life. *Nemo est hœres viventis.*

III. The court properly rejected the testimony offered by the defendants in regard to the extension of lot No. 10 into the lake by the railroad company. Though the lot extended only to low water mark, yet, incident and appurtenant to the lot, was the right of filling out into the water, either by earth, timber, or other material, to any extent not inconsistent with the public right of navigation. The filling in with earth is the same in principle as the building of a wharf. This right of wharfage, by immemorial custom in this country, is the property of every owner of land on the shores of the great fresh-water lakes and tideless navigable rivers of America, whether it existed by the common law upon the navigable waters of England, or not. It is a right essential to the value of the water-front, and greatly tends to the encouragement of navigation and commerce.

It is settled, even in England, that there is no public right of landing on the shore of the sea. *Blundell* v. *Catterall*, 5 B. & Ald. 268 ; much less is there such on the banks of our lakes and rivers. Therefore, unless the right of wharfage exists in the proprietor of the land extending to low-water mark, the right of landing, or embarkation of goods and passengers, cannot be obtained either from the state or the proprietor, for the right of the state to land under the water, carries no right to the land above low-water mark. *East Haven* v. *Hemingway*, 7 Conn. 186 ; *Champion* v. *Kimball*, 9 Conn. 37 ; *Frink* v. *Lawrence*, 20 Conn. 117 ; *Barrows* v. *Gallup*, 32 Conn. 501 ; *Dutton* v. *Strong*, 1 Black, 23, 32 ; *Railroad Co.* v. *Shurmer*, 7 Wallace, 289 ; *Gates* v. *Milwaukee*, 10 Wallace, 504 ; *Bainbridge* v. *Sherlock*, 29 Ind. 364.

Wharves have existed on the Vermont shore of Lake Champlain since the first settlement of the state, and they were always built, and owned, by the owner of the land from which they were extended into the lake ; nor was any special grant or license for that purpose obtained from the state. The usage is as immemorial in Vermont, in proportion to the age of the state, as in Connecticut. The statute (Gen. Stat. 447), which first appeared in the revision of 1839, giving to land-owners on the border of the lake, the right to wharf out into the water, conferred no new right, but was simply confirmatory of the common law of America. But if it were not so, and if it gave a new right which did not exist before, it constituted a grant to all riparian proprietors, and from that time forth, this right was incident and appurtenant to all lands so situated. A similar right is held to exist throughout Massachusetts, by virtue of an old ordinance of the Colony of Massachusetts Bay, passed in 1647, notwithstanding that colony did not embrace all the ocean-front of the present Commonwealth of Massachusetts.

This right being appurtenant to the lot, it belonged to the owner of the lot. A mere trespasser could gain no right to a wharf built by him against the lot, except by the lapse of time necessary to give title by adverse possession. *Nichols* v. *Lewis*, 15 Conn. 136. But in the present case, the railroad company, when they extended lot No. 10 into the water, and when Beckwith built his wharf, had an estate in the west part of that lot, and, of course, to the wharfage right appurtenant to it, for the life of Mrs. Austin, and no longer. When she died, their right to the lot, and all appurtenant easements, including this wharf, ceased, and the remainder-men, these plaintiffs, took the west half of the lot, with all improvements. All erections and improvements by a tenant for life, which are in existence when that tenancy ceases, belong to the owner of the fee.

If the defendants have, in good faith, believing they had a complete title in fee to this lot, made valuable improvements upon it, their sole remedy is under the betterment law. If, on the other hand, the plaintiffs have only an undivided interest in lot No. 10, they have also an undivided interest of equal extent in the

wharf. Improvements made by one tenant in common upon the undivided estate, enure equally to the benefit of his co-tenant. 1 Wash. Real Prop. 437. Ejectment will lie for the extension of lot No. 10 into the lake, and for the wharf, as well as for the lot in its original dimensions. *Nichols* v. *Lewis*, 15 Conn. 136.

IV. The court erred in deciding that the plaintiffs were not entitled to recover any part of lot No. 9. To this lot the defendants only deduced title from John Collard, in whom no title whatever was shown, and who, so far as appears, never had any possession. The deed from him was a quit-claim, upon nominal consideration. The case stands, therefore, on the plaintiffs' title.

The character of Richard Fittocks' possession of that lot, and the absence of any evidence to the contrary, show that it was under a claim of right. As the lots were without visible boundary or division, and of small value, he undoubtedly regarded both as belonging to No. 10, and, obviously, so treated them.

His will devised "all his real estate," and plainly referred to all he had thus occupied. Under the will, and in accordance with its provisions, his widow and children continued to occupy both lots after his death, for at least seventeen years; the widow and one daughter occupying the east half, and the other daughter and her husband, the parents of the plaintiffs, occupying the west half of both. When the land was divided between them by the deed of April 17, 1824, as required by the will, both lots were divided as they had always been occupied. Upon this evidence, it cannot be questioned :

1. That the possession of Richard Fittocks and his devisees, was of such a character and continuous duration, as to give them a title in fee to lot No. 9.

2. That the possession of the devisees was *under the will*, both in fact, and by construction of law. So that their title was determined by the provisions of the will; the children taking a life estate, with remainder to the grandchildren.

And if, upon this evidence, there could be any question as to the character of the possession, either before or after Richard Fittocks' death, it should have been submitted to the jury in accordance with plaintiffs' third request. It is said that, as Richard

Fittocks' possessory title had not ripened into an absolute fee at the time of his death, because it was only ten years old, the subsequent possession of his devisees for five years longer, would give them a title, not under the will, nor in accordance with its provisions, but an independent title in fee, adverse to that conveyed by the will. But this proposition will not stand examination. It is *because* the devisees take under the will, that they are allowed to add the possession of the devisor to their own. If they held adversely to the will, fifteen years fresh possession would be requisite to give title ; but that they obtained a perfect title by five years additional possession, is not questioned.

The interest of Richard Fittocks in the land, was clearly such as could be devised by will; it was so devised. The devisees who accepted the devise, and claimed under it, are bound by its terms, and must hold for the benefit of the title thereby conferred, and not adversely to their remainder-men.

Another view of the subject is decisive. The ten years actual occupancy of Richard Fittocks, being the first possession ever taken of the land, was, upon the evidence in the case, such a *prior possession* as gave him a title, even though fifteen years had not elapsed. *Doolittle* v. *Linsley*, 2 Aik. 155. He therefore owned the land in fee at the time of his decease, and it passed by his will to his grandchildren, on the expiration of the life-estate previously limited. Pending that life-estate, no adverse possession could run against the grandchildren.

The opinion of the court was delivered by

BARRETT, J. In this case the plaintiffs claim to recover possession of the premises in question, by reason of their title to an estate in remainder, under the will of their grandfather, Richard Fittocks. In 1800, said Richard took a perpetual lease of water lot No. 10. Adjoining it on the south, was water lot No. 9. He took possession under said lease, and built a dwelling and storehouse on the easterly part of No. 10, the dwelling-house extending partly upon No. 9. He enclosed the easterly half of both of said lots with a fence, and occupied what was within said enclosure as a garden and orchard, having filled in some part of No.

9 for that purpose, which was before that time low and swampy. He occupied said lots in the manner stated till his death, August 10, 1810.

I. *As to No.* 9. It appears that he occupied only the easterly half, which was separated from the other half by the fence made by him when he began to occupy. Of that lot, he had no *color* of title. Hence his possession was limited to what he enclosed and occupied. At his death, he had acquired no title to any part of that lot. His will purports to embrace only his *estate*, *real* and *personal*. He then had no estate in No. 9. Moreover, in 1805, he paid John Collard for half of the lot, and took a deed of warranty of it to his wife. After the taking of that deed, the possession held by himself, and by his wife after his decease, is to be referred to the apparent right acquired by said deed, and the *color* of title given thereby. *Brooks* v. *Chaplin*, 3 Vt. 281 ; *Ford* v. *Flint*, 40 Vt. 382 ; *Hodges* v. *Eddy*, 38 Vt. 327, 348.

Peggy Fittocks must be regarded as having been in possession after the death of her husband, under the deed of Collard, and not under the will of her husband, which will, as before remarked, did not purport to embrace No. 9 at all. She parted with her title to that lot, January 13, 1827, which title, together with the title and interest of her daughter Avis and children, in both No. 9 and 10, have been held by the defendant railroad company for several years.

In the other half of No. 9, the plaintiffs do not show that they have any title or interest. They claim in remainder under the will of their grandfather, upon the termination of the life-estate of their mother in 1870. It would be sufficient in this respect to say, that no part of No. 9 passed by the will. Yet it may properly be added that, if their mother Nelly supposed her possession, after the death of her father, to be under his will, still, she was in under color and claim of only a life-estate. So there could be no privity between her and the plaintiffs, who are claiming in remainder after the termination of that life estate under the same will. They take the title of, and from, the testator, and not of, and from, their mother. But again, it is not shown that her possession was for the period required in order to work a perfected

title in her, even if it was adverse as against all other rights, and could have enured to the plaintiffs. Finally, it appears that Mayo, Follett, and the Bradleys, had claimed and occupied No. 9, from April 17, 1827,—the date of Pomeroy's deed to Mayo and Follett, of the premises conveyed to Pomeroy by John Collard by deed of warranty dated July 4, 1825,—and that their interest and title have been in the defendants for several years, who, in virtue of such interest and title, have continued in uninterrupted possession. Such occupancy, with such title as was derived from Collard through said Peggy Fittocks, and said Pomeroy, gave the defendants a perfected title to lot No. 9. .

II. *As to No.* 10. The first question is, whether the plaintiffs own the west half of said lot, or are owners in common with the railroad company of an undivided moiety. They are owners in common, unless the instrument of partition between the tenants for life, effectuated a partition between those who took in remainder on the termination of the respective life-estates of said Avis and Nelly. We are satisfied that, as Avis and Nelly were each to have a life-estate in a moiety, so the heirs of each one were to take a moiety in remainder in fee. But we find no warrant for holding that said tenants for life were authorized to make a division that should bind those entitled in remainder, or that the division which might be thus made should be operative beyond the rights of the parties to such division. Such division as was made by them, was valid and effectual as to their respective rights as tenants for life. And yet it does not appear that in fact such division was into moieties—" equally divided "—in the sense in which those in remainder would be entitled under the will.

That instrument of partition was made April 17, 1824. On the 14th of October, 1825, said Nelly and husband parted with their title, in part, to Durkee, and on the 24th of April, 1827, they parted with the rest to Mayo and Follett, since which time, in the language of the exceptions, " it was not claimed by plaintiffs that said Nelly and Rufus ever occupied or claimed any part of the premises in question."

These plaintiffs, then, must stand upon the provisions of the will, as against the other co-owner in remainder under the will.

And it seems plain to us that the will contemplated, in the matter of determining the rights of the owners of the successive estates, that the division to be made was such as the law provided for, unless it should be made by and between the respective successive owners.

III.   On the decease of said Nelly Austin on the 5th of January, 1870, the plaintiffs succeeded in remainder to their rights of ownership, in common with the defendants, of an undivided moiety of said lot No. 10.   As the defendants were holding a title in fee under Avis and her children, and a life-estate under said Nelly, it is conceded that they rightfully held the exclusive possession of the whole of said lot up to the termination of said life-estate of Nelly.   During such rightful exclusive possession, the railroad was duly located upon said lot, and the whole of it was thus appropriated, and has ever since been held and used, and it still continues to be held and used for the ordinary, necessary, and legitimate purposes of the railroad, in exclusion of the plaintiffs from the possession, occupancy, and use thereof.   There has been no appraisal or payment of land damages to the plaintiffs under the statute, nor in any other way.   Upon this state of facts, it is claimed that the plaintiffs may maintain ejectment in virtue of their rights as tenants in common with the defendants.   To this claim we are not able to assent.   The defendants, in the language of the plaintiffs' brief, "during the life of said Nelly, might do what they pleased with the land, provided they committed no waste."   Being in possession, with such title and right, it was legitimate for them to locate and make the railroad as it was done, and to continue it, without payment of damages to any body; up to the time that the plaintiffs could assert a right in themselves as against the defendants.   It was incident to the tenure of the defendants, as well as to the title and estate of the plaintiffs, that the railroad might be located, made, and used, without payment of damages to the plaintiffs, during the period of the defendants' right to exclusive possession, by reason of such tenure.   There was no life-tenant to be regarded.   There was no remainder-man to be regarded, till such remainder-man's right to claim possession was available to him.

We think, then, that all the reasons for what was held in the cases of McAulay and the railroad, in 33 and 39 Vt. Reports, and in *Troy & Boston R. R. Co.* v. *Potter*, 42 Vt. 272, apply with unabated force in the present case. Saying nothing as to the matter of knowledge and implied assent on the part of some of the plaintiffs, upon which a point was made in the argument, it would seem that, when the defendants, in the exercise of their lawful right, as against these plaintiffs, located and made their road on the lot in question, they should no more be subjected to being ousted, or to having the plaintiffs let into co-possession, than in case the plaintiffs had been absolute owners of the whole lot throughout, and had assented to the doing of the same without first having the damages appraised and paid.

In the cases referred to, the point of the reason against permitting the land-owner to eject the corporation, or to be let into possession, joint, or otherwise, is, that the corporation had done a lawful act in locating and making the road through the land in question, without first having the damages appraised and paid. In those cases, the lawfulness of the act resulted from the consent of the land-owner. In the case before us, the act was equally lawful, it having been done by the party lawfully in possession, and who might lawfully do it by reason of his title and estate in the premises. This being so, we think it would contravene both the reasons and the rules that have had operation and force on this subject, now to hold, that the lately accruing right to the plaintiffs of availing themselves of their estate in the premises, changes what the defendants have done in locating, making, and maintaining their railroad, into a wrong as against the plaintiffs, and the exclusion of them from a co-occupancy, into such an unlawful ouster, as to entitle them to maintain this action. On the other hand, the provisions of the statutes seem plainly to indicate the legislative sense of the state to be in harmony with the judicial sense, as manifested in the decided cases involving the subject. Sec. 17, ch. 28, Gen. Stat., which makes provision for the appraisal of land damages, in case the parties do not agree about them, contemplates that land may be taken, and damage thereby sustained, before appraisal shall have been made; and it pro-

vides for the appraisal and payment of damages in such cases, as well as in others.

In this connection it should be remarked that the provisions of the statute for the appraisal of damages before the railroad can be lawfully made, do not seem to contemplate, or to be adapted to, a case like the present. This case does not fall within the terms, or the meaning, of sec. 20 of that chapter, which section is applicable only to cases in which damage to right of dower, or estate for life, or years, is to be appraised. Here was no estate for life to be damaged, for it was owned by the defendants ; and so it was not a case for appraising damages to the interests in remainder. Indeed, the inapplicability to this case of the other incidental details in the provisions for the appraisal of land damages before the making of the road, enforces the idea, that cases like the present were not intended to be subject to those provisions.

When we turn to sec. 26 of the same chapter, it is seen to be full and explicit in provisions for such cases. Thus : " In every case where a railroad company have entered upon, taken possession of, and used, land and real estate for the construction and accommodation of their railroad * * * and shall not have paid the owner therefor, nor, within two years from such entry, had the damages appraised, &c., the ordinary courts of law shall have jurisdiction thereof, to wit: justices, &c. and the county courts, &c. ; and any person claiming damages may bring suit therefor in the usual form, &c. ; and shall recover only actual damages." This seems to contemplate that the company might have two years after such entry, taking possession, and using, in which to get such damages appraised, pursuant to the provisions of sec. 17. It seems difficult to suppose that it was contemplated at the same time, that, *in the mean time*, they should be liable to be ousted by action of ejectment. We think that the alternative remedy provided in sec. 26, clearly indicates that, after the lapse of said two years, without such appraisal having been made, not by ousting the company by action of ejectment, but by suit for damages, the land owner is to get what he would have realized as the fruit of the proceeding provided in sec. 17.

These provisions of the statute seem to recognize the peculiar character of the subject-matter, much as the court, have recognized and regarded it in our own, and in other states.  A most marked instance of such recognition is the case of *Sturgis & Douglass* v. *Miller & Knapp*, 31 Vt. 1.   The same is true of the other cases above referred to.   We concur, then, in holding that, in this case, as it is now before us, the plaintiffs are not entitled to have a judgment giving them co-possession with the defendants of the land in question.

In the views thus presented, we design to propound the law only of the present case, leaving cases made up of other elements, and characterized by different features, to abide such consideration as may seem meet when they shall be before the court for adjudication.   In holding as we do in this case, we are not unmindful that a party in ordinary cases, unaffected by peculiar statutory provisions, would be entitled to maintain ejectment against his co-tenant when wrongfully excluded from the possession of the common property by such co-tenant.   We put the decision on the ground, as above indicated, that the subject-matter (when regarded with reference to the law ordinarily governing the action of ejectment, in its origin and development) is extraordinary and peculiar ; that the property was lawfully put to its present use by the defendants, as against these plaintiffs; that special statutory provision is made for ample remedy in such case ; and, having reference to the public interests involved in, and affected by, the construction and operation of railroads, and in view of what has been held in other cases, standing upon the same reasons, it is fairly to be assumed that such statutory provision for remedy, was intended to supersede the common remedy by action of ejectment, which is available in ordinary cases between tenants in common.

We have not deemed it advisable to enter upon a discussion of the question, whether the plaintiffs would have a lien for the damages recovered by them under said § 26, as our attention was not called to it in the argument, except by a passage in the brief for the defendants, that "plaintiffs' rights to full damages are reserved to them by a specific lien on the lands,"—citing said §§ 17 and

32

26, Gen. Stat. ch. 28. Of course, aside from such resource, they would have all the rights of any judgment creditor for enforcing judgment against a judgment debtor.

IV. It is claimed for the plaintiffs that the land and dock that have been made by the defendants into the water of the lake further west than the land extended naturally, are embraced within the estate which they own under the will of their grandfather.

The township, by the charter, was bounded west " on the shore of Lake Champlain." The lot was bounded " west by the waters of Lake Champlain." In the year 1800, that lot, thus bounded, became the property of said testator. It remained unchanged in that respect, and in the condition of its water-front, during the life of the testator, and up to the time when the defendants made said additions of land into the water of the lake. Neither the testator, nor any one under him, made any erections or structures on the water-front in the character of pier, dock, wharf, or store-house, so nothing had been done in the nature of asserting or exercising any right in those respects, as appertaining to that lot, in reference to the lake, for any purpose. The testator enclosed and occupied, during his life, only the east half of said lot. Defendants' counsel understand that lot No. 10 extended to low water mark, and that the estate of the plaintiffs extends to the same line. The right of the plaintiffs is thus conceded to the utmost limit of title and ownership in the soil known to the law, as shown by the text books and decided cases, whether in the nature of a corporeal or incorporeal hereditament. All that can be claimed for the plaintiffs, as the ground of their alleged title and interest in the made land, is the right that the owner of said lot, as it originally was, had to pass to and from the water of the lake within the width of the lot, as it bordered on, and was washed by, said water. It is not denied that the lake is " navigable water," in the sense of the law governing public and private rights in respect thereto. There is no occasion, therefore, to discuss, or decide, whether the common law of England, or of Massachusetts, or of Connecticut, or of any other state, is the common law of Vermont, as to such rights. We remark, however, that there is no *common law* of Vermont, by which the owner of land bounded

on Lake Champlain, has a right beyond low water mark to appropriate as his own the bed of the lake. Neither the legislature nor the courts have recognized any such right, only as it has been conferred by act of legislation. And the whole course of legislation on the subject indicates that there was no such right by any kind of common law in this state. See act of 1802, granting to the Burlington Bay Wharf Co. the privilege of erecting and continuing a wharf; also the act of 1825, giving the right to Messrs. Keyes to extend a wharf into the lake from low water mark; also acts No. 41 and No. 42, in 1826, of a similar character.

The matter had thus proceeded up to 1839, when, in the Revised Statutes of that year, § 7, ch. 59, it was enacted that "all persons who may have erected any wharves, &c., *agreeably to the provisions of any grant heretofore made*, or agreeably to the provisions of this chapter, their heirs and assigns, shall have the exclusive right to the use, benefit and control of such wharves, &c., forever." This seems plainly to show the idea of the legislature to have been, that the right to build a wharf, or any other structure, beyond the land of the riparian owner into the water of the lake, depended on a legislative grant, either shown or presumed. And the same is as clearly shown by the preceding § 5, viz: "Any person owning lands adjoining Lake Champlain may erect any wharf or store-house, and extend the same *from the land of such person* in a direct course into Lake Champlain * * between the lands of such person and the channel of the lake." This contemplates that the right to build into the lake "*from the land*," &c. is given by that provision of the statute.

There is no ground for claiming that those general legislative enactments were only in affirmance of already existing common law of the state; for, not only does the fact of such legislation and the terms and provisions of it, discountenance such claim, but the special legislation that preceded it, and which is emphatically recognized in said § 7, ch. 59, Rev. Stat., is altogether inconsistent with it.

The right, then, that existed in the testator as owner of lot No. 10, was not a right *appurtenant* to the lot to build into the lake in front of it. He had only, and at most, so far as the lake was

concerned, a right, in common with all other persons, to use the waters of the lake in any proper way, and for any proper purpose. As the absolute owner of said lot, he had the exclusive right to use it in passing to and from the lake. But this gave him no peculiar or additional right as to the lake itself. Of course it could not give him title to erections or structures made by others beyond the limits of his own land. If, in making such erections and structures, others should violate any right of his, as owner of the land to low water mark, he could seek redress in some proper way, but not by action based on his right as the owner of them. If they should be a nuisance in the legal sense, the abatement of them might be invoked by a proceeding proper for that purpose. The doctrines of the law as applicable to this feature of the case, are well developed and applied in *Gould* v. *Hud. Riv. R. R. Co.* 2 Seld. (6 N. Y.) 522, and in *Pres't, &c. Harv. Coll.* v. *Stearns*, 15 Gray, 1; also in *Pat. & New. R. R. Co.* v. *Stevens*, Law. Reg. March, 1871, p. 165.

In those cases the learning of the subject is so amply embodied, analyzed, and applied, that little would be gained by repeating what has been done by the learned courts in the decisions referred to. The case of *Nichols* v. *Lewis*, 15 Conn. 136, is not at odds with the views which we hold in the case in hand. In that case it was held, that the plaintiff owned a tangible property between high and low water mark, where the tide ebbed and flowed, of which he was entitled to the possession as against the defendant, by whom he had been ousted, and that he could recover by ejectment the possession of the *locum in quo*, notwithstanding the defendant had made on it a dump, or fill of earth,—so far as the dump was concerned, it being put on the same ground, "as if a man builds on another's land, the building belongs to the owner of the land." The kind of estate which, in Connecticut, a riparian owner on navigable water, like the plaintiff in that case, has in the shore, is indicated by Ch. J. HOSMER, 7 Conn. 202, in commenting on a passage in Swift's System. He says: "By this expression I do not understand that the proprietors alluded to were *seised*, but they had a right of occupation, properly termed a franchise." Those cases were very different from this. Here was no

building *upon* the plaintiffs' land, only an abutting against it by a structure made outside of it.    It is not a case of accretion or gradual reliction, which belongs to the riparian owner.    It does not fall within the right *usque ad cœlum*, for that, of itself, does not often extend more widely than the *solum* of the owner, on which such right must be grounded.    Most of the other cases cited by plaintiffs' counsel arose with reference to the right to appropriate and use the shore, the space between high and low water mark, where the tide ebbs and flows.    As to rights beyond low water mark, they countenance and maintain our views in this case.    In *Blundell* v. *Catterall*, 5 B. & Ald. 268, it is shown that the exclusive right in the plaintiff, to the shore of the navigable water in question, did not exist except by grant from the crown. In that case the learning on the subject of riparian rights along navigable waters is exhaustively developed by discussion and citation, and entirely in consonance with the present decision.

We have examined the cases cited in the U. S. supreme court reports, and find that none of them maintain a right of soil in the plaintiffs ; and that must be maintained in order to entitle them to recover in ejectment the made land in question.    The case of *Dutton et al.* v. *Strony et al.*, 1 Black, 23, most confidently urged upon our attention by counsel for the plaintiffs, countenances precisely what we hold as to rights beyond low water mark.    We cite some passages of the opinion, by CLIFFORD, J., p. 31 : " Bridge piers and landing-places, &c., are frequently constructed by the riparian proprietor on the shores of navigable rivers, bays, &c., as well as on the lakes ; and where they conform to the regulations of the state, and do not extend below low water mark, it has never been held that they were a nuisance, unless it appeared that they were an obstruction to the paramount right of navigation." * * * " Our ancestors, when they immigrated here, undoubtedly brought the common law with them ; * * but they soon found it indispensable, in order to secure these conveniences, to sanction the appropriation of the soil between high and low water mark to the accomplishment of these objects.    Different states adopted different regulations upon the subject, and in some the right of the riparian proprietor rests upon immemorial local

usage. * * * Wherever the water of the shore (of the lake) is too shoal to be navigable, there is the same necessity for such erections, as in bays and arms of the sea ; and when that necessity exists, it is difficult to see any reason for denying to the adjacent owner the right to supply it; but the right must be understood as terminating at the point of navigability, when the necessity for such erections ordinarily ceases." The question in that case was, whether the defendants, who had built such a pier on the shore of Lake Michigan, had such a property right in it as to entitle them to prevent the plaintiffs from causing its destruction by hitching their vessel to it in stress of weather :—a very different question from that of right of soil in land made by another, outside of the testator's water-front of low water mark, into the body of the lake. The other cases cited need no comment, for it is not claimed that they are more in point than those noticed above.

According to the foregoing views, the exception taken by the plaintiffs is not maintained. On the defendants' exceptions, the judgment is reversed. The cause is remanded.